Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/15/2017 05:13 PM CDT

State of Nebraska, appellee, v.
Dale V. Nollen, appellant.
___ N.W.2d ___

Filed March 17, 2017.    No. S-16-133.

1. **Constitutional Law: Sentences.** Whether a sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment presents a question of law.
2. **Judgments: Appeal and Error.** When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling.
3. **Sentences: Statutes: Time.** The good time law to be applied to a defendant's sentence is the law in effect at the time the defendant's sentence becomes final.
4. **Judgments: Convictions: Sentences: Final Orders: Time: Appeal and Error.** A defendant's sentence becomes final on the date that the appellate court enters its mandate concerning the defendant's appeal, if there is indeed an appeal. If no appeal is taken from the judgment, that judgment becomes final.
5. **Constitutional Law: Sentences.** A sentence imposed in violation of a substantive constitutional rule is not merely erroneous, but void.
6. **Constitutional Law: States: Minors: Convictions: Sentences: Probation and Parole.** It is unconstitutional for a state to impose a sentence of life imprisonment without parole on a juvenile convicted of a nonhomicide offense.
7. **Minors: Convictions.** Juvenile offenders convicted of nonhomicide crimes must be given some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.
8. **Minors: Sentences: Judgments.** Although the possibility of a sentence of life imprisonment without parole for a juvenile is not foreclosed, a sentencer must take into account how children are different and how those differences counsel against irrevocably sentencing them to a lifetime in prison.

9. **Constitutional Law: Sentences: Homicide.** Felony murder is a homicide offense for purposes of Eighth Amendment sentencing analysis.
10. **Constitutional Law: Criminal Law: Sentences.** The Eighth Amendment does not require strict proportionality between crime and sentence, but, rather, forbids only extreme sentences that are grossly disproportionate to the crime.
11. **Sentences: Judgments.** The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observations of the defendant's demeanor and attitude and all of the facts and circumstances surrounding the defendant's life.

Appeal from the District Court for Washington County: JOHN E. SAMSON, Judge. Affirmed.

Adam J. Sipple, of Johnson & Mock, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

HEAVICAN, C.J., WRIGHT, MILLER-LERMAN, CASSEL, STACY, KELCH, and FUNKE, JJ.

KELCH, J.

## I. NATURE OF CASE

In 1983, Dale V. Nollen, at age 17, pled guilty to first degree murder and was sentenced to a mandatory term of life imprisonment. Pursuant to the U.S. Supreme Court decision in *Miller v. Alabama*,[1] this sentence was vacated. Prior to resentencing, a hearing was held, and Nollen produced evidence of certain mitigating factors, as well as evidence of his reform while in prison. Following the hearing, Nollen was resentenced to 90 years' to life imprisonment. Nollen appeals this sentence, alleging, among other things, that the sentence violates the 8th and 14th Amendments to the U.S.

---

[1] *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

Constitution and the principles set forth in *Miller* and *Graham v. Florida*.[2]

## II. BACKGROUND

### 1. Overview

Nollen was 17 years old in January 1983 when he and a friend, Brian D. Smith, participated in criminal acts which led to the death of Mary Jo Hovendick (Mary Jo). Nollen turned himself in to the police, pled guilty to first degree murder, and was sentenced to mandatory life imprisonment.

In 2010, the U.S. Supreme Court decided *Graham*,[3] in which it held that the Eighth Amendment prohibits the imposition of life imprisonment without parole upon juvenile offenders who have not committed homicide. In 2012, in *Miller*,[4] the Court held that the Eighth Amendment prohibits *mandatory* life imprisonment without parole for juvenile offenders.

In 2013, Nollen filed a motion for postconviction relief, which was granted. The district court vacated Nollen's sentence and ordered a presentence report and comprehensive mental health examination pursuant to Neb. Rev. Stat. § 28-105.02 (Reissue 2016). A resentencing hearing was set for January 4, 2016.

### 2. Resentencing Hearing

At the resentencing hearing, Nollen's counsel argued that Nollen should receive a lesser sentence because of mitigating circumstances at the time of the crime and because Nollen's character had been reformed while he was in prison. In summarizing the evidence presented at the resentencing hearing, we take a chronological approach. We first review the evidence of mitigating circumstances leading up to Nollen's offense. We next review the evidence of the offense, Nollen's

---

[2] *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010).

[3] *Id.*

[4] *Miller v. Alabama, supra* note 1.

confession and conviction, Nollen's time in prison, and the results of a comprehensive mental health examination conducted on Nollen in 2015. Finally, we set forth the facts concerning the district court's disposition of this case.

(a) Mitigating Circumstances

The evidence of mitigating circumstances comes mostly from the presentence report. According to the presentence report, Nollen ran away from home on December 31, 1982—11 days before the events leading to his conviction. Nollen reported that at the time of his offense, his father was an alcoholic and was physically abusive toward Nollen and his mother. His mother was also an alcoholic.

In 1983, Nollen's neighbors gave written statements indicating that there was "constant fighting" within Nollen's home and that Nollen was often left home alone with his younger sister. One neighbor stated that Nollen "always seemed eager to do things with [the neighbor's] family" and would sometimes visit just to "get away from home when there were family problems." Other Blair, Nebraska, citizens were aware of Nollen's parents' drinking problems and that Nollen's homelife was "not very pleasant." Records indicate that the police received several calls regarding the Nollen residence for such things as child abuse and neglect. Due to a fire, however, reports made in connection with those calls are not available.

On January 3 or 4, 1983 (2 to 3 days after Nollen left his home), Nollen dropped out of school. He was in his senior year. Nollen reported that high school was "'rough,'" that he didn't "'fit in,'" and that other students made fun of him for wearing "hand-me-down" clothing.

On January 5, 1983, Smith attended a church choir rehearsal in Blair. According to a statement made by the director of the choir, Nollen went to her and informed her of his plans to run away to Missouri with his friend, Smith. The director and the director's mother, who was an accompanist for the group, asked Nollen if he wanted to talk to the reverend about it. The

director's mother found the reverend, and the three of them talked to Nollen about why he wanted to run away. Nollen talked about "bad family life—parents drinking, parents taking his money, no one ever caring." Although the three adults tried to convince Nollen to finish school and stay home at least until he was 18, Nollen stated that he was "'at the end of [his] rope.'"

(b) The Offense

The following version of the offense is taken primarily from Nollen's 2007 application for commutation, which was admitted into evidence at his resentencing hearing. The application was also admitted into evidence at Smith's resentencing hearing. Accordingly, the facts set forth below are almost identical to those set forth in this court's opinion disposing of Smith's appeal.[5]

On January 11, 1983, Nollen was living with his friend Smith's older brother and the older brother's girlfriend. Nollen had "a bit of a crush" on her and accompanied her to Omaha, Nebraska, for a job interview. On the way back to Blair from Omaha, she asked Nollen if he knew where they could get $50 to pay a gas bill. Nollen thought for a while and came up with the idea to rob a doughnut shop in Blair. He had worked there previously and was familiar with the layout. When Nollen worked there, the money from a day's sales was left in the store overnight and deposited the next morning by the owner. Nollen explained in the application, "[A]ll I would have to do is go in the back door, go down stairs to the basement and wait until everyone left. Then, go upstairs, get the money and leave . . . ." Smith's older brother's girlfriend agreed to the plan, but told Nollen not to tell Smith's older brother because he would not approve.

When Smith older's brother's girlfriend and Nollen returned to Smith's residence, Nollen told Smith about the plan and asked Smith if he wanted to go with him. Smith said he did.

---

[5] See *State v. Smith*, 295 Neb. 957, ___ N.W.2d ___ (2017).

At around 3 p.m. on January 11, 1983, Smith and Nollen went into the doughnut shop to see who was working. It was 21-year-old Mary Jo. After Smith and Nollen talked to Mary Jo briefly, they left the doughnut shop through the front door, walked around to the back alley, through a back door of the doughnut shop, and into the basement of the shop.

Smith and Nollen waited in the basement. They "smoked a couple bowls of pot and talked about how pretty Mary Jo is." Nollen made a comment "about the only way [they] would have a chance with her would be to take it." Smith asked Nollen if he wanted to, and Nollen laughed and said "okay." According to Nollen, they got up and walked toward the stairs and Nollen then stopped and said, "[F]___ that, if we did that we would have to kill her so she wouldn't tell on us." Smith and Nollen went back and sat down again.

Smith and Nollen did not talk much for the next hour or so. During that time, Nollen thought about how pretty Mary Jo was and "how nice it would be to have sex with her." Nollen knew Mary Jo from school. Nollen wrote, "She had the reputation of being really quiet, shy - a loner but popular. She never had a boyfriend, so I was thinking if I had sex with her and messed up, she would never know because she has never been with anyone." Nollen "fell asleep thinking about [Mary Jo]," and Smith woke him up about an hour later.

Because neither Smith nor Nollen had a watch, neither one knew how long they had been waiting. Without knowing what time it was, they walked upstairs to see if they could hear anything. They determined that the store was closed, because Mary Jo was in the office. Nollen could hear her counting the money and told Smith that she was getting the money ready for deposit. He explained that this meant that she would take it to the bank and there would be only $20 left in the register (instead of about $200). Nollen asked Smith what he wanted to do, and Smith said, "[L]et's get it all."

Smith ran to the stairs and hid, and Nollen waited by the office door. After Mary Jo saw Nollen, Nollen walked up to

her and put his hand over her mouth so she would not scream. Nollen took her out to the hallway and instructed Smith to go and get the money. Smith got the money and put it in his pockets.

Nollen asked Mary Jo about her car, and she told him where it was. Nollen told Smith that he was going to get the car and that when Nollen honked the horn, Smith was to come out with Mary Jo. Smith complied. After the two of them got into the car with Nollen, he drove off. They stopped at a gas station, and Smith got out and put gas in the car, then went in and paid for it. After they left the gas station, Smith said he wanted to drive, so Smith and Nollen changed places. Smith drove around country roads while Nollen went through Mary Jo's purse, took $20 and gave it to Smith, then threw her purse and its contents out the window.

Mary Jo had been sitting on the center console, so Nollen told her she could sit on his lap and pulled her toward him. Mary Jo slid over and sat on one of Nollen's legs. According to Nollen, he started thinking about having sex with Mary Jo again. He wrote, "It was really intense now, because I could smell her perfume and feel how soft her skin is." Nollen told Smith to pull over, and Smith complied. Nollen forced Mary Jo into the back seat and climbed back there with her. He told Mary Jo to take her clothes off. At first, she did not comply, but then Nollen told her angrily "so she would listen." Eventually Mary Jo complied. Nollen got on top of Mary Jo and penetrated her with his fingers while Mary Jo tried to push him away and asked him to stop. Nollen then tried to penetrate her with his penis, but was unsuccessful because Mary Jo "was pushing on [his] sides." Nollen wrote, "I was mad because I was not getting what I wanted, so I rubbed against her until I got off."

Nollen then asked Smith "if he wanted to come back" with Mary Jo, and Smith said that he did. The two switched places. Nollen said that he could hear Smith telling Mary Jo to kiss him and that he then "turned the radio up and started to figure

out how [they] were going to get out of this." Nollen said he "knew that the only way would be to kill Mary Jo but, [he] did not know how it would happen."

Eventually, Smith and Nollen traded places again, and Smith drove the car back toward Blair. Nollen told Mary Jo to get dressed, and he tied her hands up with a ribbon that had been around her neck. Nollen then got back in the front seat of the car. Smith drove the car through Blair to a trailer park "by the river."

Smith and Nollen got out of the car and looked around. Nollen wrote, "We did not talk but, I think we both knew what was going to happen. I look at the bridge and thought we could throw her over the side. So I told [Smith] that when we get half way [sic] over the bridge to stop [and] he said okay . . . ." When they got halfway across the bridge, Nollen got "really scared" and worried that someone might see, so he told Smith to keep driving. Smith drove across the bridge and turned to go underneath it. They pulled up to a dock by the river. Nollen got out of the car, and Smith followed.

Nollen wrote, "I figured, I would kill her by stabbing her." Nollen asked Smith for a knife that he had taken from the doughnut shop, and Smith gave it to him. Nollen pulled the passenger seat forward and looked at Mary Jo. When Nollen brought the knife toward Mary Jo, she screamed and started crying. Nollen looked at her and told her he was sorry. She kept crying, and Nollen threw the knife into the river and told her, "'[S]ee, I [sic] not going to hurt you.'" Nollen wrote that he looked at Smith and said he could not do it. According to Nollen, "[Smith] shrugged and leaned into the car. The car jumped forward and I jumped back. The car rolled down the dock into the river. I seen the car hit the water and I just stood there." Nollen then told Smith that they "needed to get the hell out of there." The car was still floating in the water when they left.

This version of events is largely consistent with the version that Nollen told the police after he was convicted and

sentenced in January 1983. In 1983, Nollen added that Smith had rolled down the driver's side window all the way. Before Smith put the car into gear to drive into the river, Nollen told Smith to roll it up so that it was open only 3 inches. The passenger's side was also open about 3 inches.

### (c) Nollen's Confession and Conviction

The day after the offense, Smith and Nollen went to a bowling alley with Smith's older brother and his girlfriend. After an emotional encounter with Nollen's parents, Nollen hugged Smith's older brother and started shaking. He told Smith, "'I've got to tell him. I've got to tell him.'" Smith told Nollen to go ahead. Nollen told Smith's older brother about how they had robbed the doughnut shop and "killed a girl." Early the next morning, Smith's older brother took Smith and Nollen to the Blair Police Department, where they were arrested.

Before questioning Smith and Nollen, police waited for their parents to arrive. An officer contacted Nollen's mother to tell her that her son was in custody and to ask her to come to the station. She asked what he was being charged with, and the officer advised her that he was being charged with murder but would not explain further over the telephone. She stated, "[Y]ou will or else." The officer explained that he was very busy and could not continue arguing over the telephone. Nollen's mother then asked the officer what he was "trying to pull" and told him he was "pushing [his] luck." The officer thanked her and hung up. Five minutes later, Nollen's father called the officer, demanding the details of the charge. The officer asked the father to come to the station, but he refused.

Eventually, Nollen's parents were persuaded to come to the station. After an officer "read the *Miranda* warnings" to Nollen and his parents, the parents stated that they did not want Nollen to answer any questions without an attorney. Police honored the request and did not ask Nollen any questions.

Prior to Nollen's plea hearing, Nollen was evaluated for competency. The evaluator concluded that Nollen was competent to assist in his own defense. He diagnosed Nollen with "Conduct Disorder-Socialized, Aggressive," noting that "[w]ere [Nollen] 18, [he] would seriously consider a diagnosis of Antisocial Personality Disorder."

On January 24, 1983, Nollen pled guilty to first degree murder, a Class IA felony, which carried a mandatory sentence of life imprisonment. In exchange for Nollen's plea, the county attorney agreed to drop charges of kidnapping, sexual assault, robbery, and burglary. Nollen waived his right to a presentence investigation and was thus sentenced the same day he entered his guilty plea.

### (d) Time in Prison

Since Nollen began serving his sentence in 1983, he has earned his diploma through the GED program and earned an associate degree in business administration from a community college. He has also earned a number of institutional programming certificates. Nollen completed an inpatient sex offender program, generic outpatient levels format programming, and substance abuse programming.

At the resentencing hearing, Nollen called three Department of Correctional Services (DCS) employees to testify about the programs he participated in and the employees' impressions of Nollen as an inmate. Their testimony is summarized below.

### (i) David Erickson

David Erickson began working as an officer for DCS in 1997 and became familiar with Nollen around that time. Sometime during or prior to 2000, Erickson became a housing unit manager and was assigned to manage Nollen's unit. During the 4 to 5 years that Erickson served as Nollen's housing unit manager, Erickson interacted with Nollen on a daily basis and was aware of some of the activities Nollen was involved in. For example, Erickson was aware that Nollen was "heavily involved" in

Bible studies that took place in the yard and also with a Sunday night worship group.

Nollen was also selected to serve as the representative for his unit wing for the unit's "town hall" meetings. In that role, he was responsible for interacting with inmates from his wing to ensure that the wing's grievances were aired. Nollen was selected by staff based on his disciplinary history, his rapport among the staff and inmates in the unit, and his longevity in the unit. Erickson testified that he could not remember a time when Nollen was not the representative for his wing.

Nollen was also selected as one of four or five inmates to work in the unit's supply room. This "high-profile" position requires applicants to interview for the job and go through a vetting process where institutional behavior and programming are considered. According to Erickson, Nollen has held a few other "high-profile" positions, including in a workshop and a medical quarter.

Erickson also testified about Nollen's history of misconduct reports. However, first, Erickson explained the use of "misconduct reports" within the Omaha Correctional Center. He explained that when an inmate is assigned to a housing unit, he or she is given a copy of the housing unit rules. If the inmate violates one of the rules, a misconduct report may be issued. Misconduct reports are issued for such things as loitering in a no-loitering area, use of abusive language, gestures, fighting, et cetera. Erickson testified that it is not uncommon for an inmate to receive 5 to 10 misconduct reports per month.

A printout of Nollen's report history shows that from March 1990 to February 2012 (a period of 22 years), Nollen received five misconduct reports—a number that Erickson described as "extremely minimal." Erickson testified that it was very possible that Nollen had misconduct reports prior to 1990, but that the older reports may not have been added to a newer system.

For the first three instances of misconduct, Nollen received verbal reprimands. According to Erickson, this is one of the

lowest-severity sanctions that can be imposed. Nollen received his fourth misconduct report and a sanction of 10 hours of extra duty for giving another inmate a haircut. Then on February 8, 2012, Nollen received another misconduct report and a sanction of 20 hours' extra duty for "disruption." According to Erickson, Nollen got into a nonphysical argument with a supervisor in one of the shops in which Nollen worked.

When asked how he would describe Nollen as an inmate, Erickson stated that "[H]is behavior has been more than acceptable. I can't recall an issue, basically, any disciplinary matter with him of an aggressive or violent sense . . . . [H]e does not get in trouble. He is very diligent in his duties. He receives above-average work reports." Erickson added that Nollen was a "leader amongst the inmates" and that he communicated positively with other inmates. Erickson testified that Nollen's interactions with staff and other inmates have been of a professional manner.

### (ii) David Hanson

David Hanson has worked as the "East Gate officer" at the Omaha Correctional Center for the 2½ to 3 years preceding trial. His job includes supervising inmates in the area near the center's east gate, which is where the supply room and all the shops are located. Hanson testified that he interacted with Nollen on a daily basis, discussing such things as the weather, issues with Nollen's family, religious topics, and Nollen's guitar playing.

When asked how Hanson would describe Nollen as an inmate, Hanson said, "Nollen [is] a very cooperative inmate. I've had no issues with him. He's always been very respectful not only of myself, but other individuals, whether it be other inmates, other people that he's working with, or . . . the civilian vendors that come in. His demeanor has been pleasant."

### (iii) Cassandra McCutcheon

Cassandra McCutcheon is a caseworker whose primary responsibilities concerned the safety and sanitation of the

inmates housed within Nollen's unit. Since 2014, McCutcheon had interacted with Nollen on a daily basis and was familiar with some of the activities that Nollen had been involved in.

McCutcheon testified that Nollen participated in a foster dog program in which he cared for and trained dogs waiting to be adopted from the Nebraska Humane Society. To participate in the program, an inmate must interview for the position and meet certain standards regarding his or her classification and history of misconduct reports. The applicants are then selected by both DCS and the Nebraska Humane Society staff. Out of 160 inmates, Nollen was selected as one of 10 dog handlers. McCutcheon described Nollen as being "very good with dogs" and stated that he was patient, kind, and gentle with the dogs.

As for other evidence of Nollen's time in prison, the State offered an exhibit entitled "Psych Evaluations and Data." The exhibit includes assessments conducted on Nollen while he was incarcerated, including a number of "Multiphasic Sex Inventory" assessments ranging from 1986 to 1997. In its brief on appeal, the State asserts that these assessments suggest that Nollen had sexually deviant interests. In Nollen's reply, he argues that no witness testified "about the accuracy, meaning, and significance" of these random "excerpts" pulled from Nollen's record and that therefore, the State is asking the court to speculate about the almost 20-year-old assessments.[6]

The exhibit also includes a psychological evaluation performed on Nollen in 1993. The psychologist performing the evaluation concluded:

> Nollen appears to have a number of personality features characteristic of an anti-social personality. He is impulsive and egocentric. He tends to lack concern about the welfare of others and has trouble dealing with rules and authority. He appears to be at a stage of treatment where he is aware of some of the problem areas, and is

---

[6] Reply brief for appellant at 1.

attempting to deal with such in rather superficial ways. . . . Nollen also has a big problem with the abuse of alcohol. He has shown some interest in self-improvement by taking vocational and college classes, and by participating in mental health programming. He has held the carpentry shop work assignment since 1986. In view of . . . Nollen's achievements and satisfactory institutional adjustment, this study can support the idea of promotion to Minimum A custody.

### (e) 2015 Mental Health Examination

In 2015, Dr. Kirk Newring performed a comprehensive mental health examination on Nollen. Newring is a psychologist working in Papillion, Nebraska, specializing in court-involved mental health and behavioral health. In conducting Nollen's examination, Newring attempted to address the following mitigating factors, which are set forth in § 28-105.02(2):

(a) The convicted person's age at the time of the offense;

(b) The impetuosity of the convicted person;

(c) The convicted person's family and community environment;

(d) The convicted person's ability to appreciate the risks and consequences of the conduct; [and]

(e) The convicted person's intellectual capacity[.]

In addition to evaluating the above factors and how they contributed to Nollen's offense, Newring also assessed Nollen's risk of future violence and future sexual violence. Newring then submitted a report with his findings and conclusions, and he also testified at the resentencing hearing.

### (i) Age

Nollen was 17 years old at the time of the offense. Newring testified that this was significant for sentencing purposes, because "what we know about neuropsychological development now is that the executive functioning, the decision-making capacities, are not fully formed until a person is age

25." According to Newring, at 17, Nollen's brain was not fully developed and Nollen was thus more likely to act impulsively and take risks.

As evidence of the research on the neuropsychological development of adolescents, Newring attached to his report an amici curiae brief filed by the American Psychological Association, amongst others, in *Graham*.[7] That brief was also an exhibit in *State v. Smith*,[8] and we summarized its content in that case.

### (ii) Impetuosity

According to Newring, in psychology, "impetuosity" refers to "the person's impulsivity, decision-making, and deliberative processes." Newring testified that juveniles typically tend to be more impulsive than adults because the prefrontal cortex of the brain is not fully developed. The prefrontal cortex is the portion of the brain responsible for executive functioning, decisionmaking, and the weighing of risks and rewards. Newring testified that with the influence of testosterone, "an adolescent male is going to have great difficulty inhibiting or stopping behavior, especially when there's goal-driven behavior, where there's a physical reward, a tangible reward, or a sexual reward clearly present."

Although "the benefit-seeking system is raging" for all adolescents, Newring admitted that most adolescents "don't go out and do the things . . . Nollen did." He testified that risk factors of youthful violence include exposure to violence in the home, substance abuse, "delinquent peer group," and poor school achievement. Newring testified that all risk factors were present in Nollen's case.

On cross-examination, Newring was asked why none of Nollen's siblings, who grew up in the same environment, committed acts such as Nollen. Newring stated that the primary

---

[7] *Graham v. Florida, supra* note 2.

[8] See *State v. Smith, supra* note 5.

reason was that "they're women and women tend to engage in violent acts less often than men." But Newring added, "It's my understanding that both [of Nollen's] sisters have had psychological struggles over their entire lives."

According to Newring, Nollen's problem-solving approach at age 17 suggested that Nollen was "an impetuous young man" whose planning and deliberate processes were focused on the next 24 hours or less. Newring explained that as an adolescent, Nollen tended to run away from his problems (e.g., literally running away from home or "pour[ing] booze" on his psychological pain). If he did not run away from his problems, he took short-term solutions (e.g., stealing money, rather than getting a job and saving money). Newring testified that Nollen's way of dealing with his problems suggested that Nollen's underdeveloped brain allowed him to see only immediate and short-term solutions rather than long-term or more global solutions. When applied to the challenges Nollen faced on the day of the offense, Newring testified, it resulted in a series of bad decisions that led to the only option Nollen could see: Mary Jo's death.

### (iii) Family and Community Environment

In relation to Nollen's family and community environment, Newring testified:

> [Nollen] grew up in a home where the mother and father liked to go out and drink, come home, and it was described more often that the mother would initiate a verbal fight, the father would return with a physical aggressive move, and that [Nollen] would sometimes try and break it up and get involved.

> [Nollen] was beaten up by his dad, [Nollen] was involved in fights with his mom and dad, his older sister was involved in fights with mom and dad, [Nollen] and his older sister were left to raise themselves and their younger sister. This all suggests as a young man [Nollen] was tasked with psychological social development burdens that he was not equipped to address.

. . . .

Those are the things that stood out about [Nollen's] early childhood social history, the large amount of family conflict, the modeling of substance abuse, and that family members spoke of [Nollen's] yearning to escape the house and yearning for some healthy guidance.

Newring noted that Nollen was "almost desperate to get the approval of others." Because Nollen came from a poor family and was picked on by peers at school, "the only peer group [Nollen] could find [was] these over-malcontent and delinquents, and that's where he was able to find a harbor in the storm." Newring testified that "[p]leasing this group led to increased substance abuse, just as was modeled at home, increasing in rule-breaking behavior because that's what was modeled by this peer group, and these activities are consistent with what we know about peer pressure and peer influences in late adolescence in males."

As for peer pressure, Newring testified that since the time of the research that informed the Supreme Court ruling in *Miller*, followup studies have shown that "it's not just direct peer influence, but the perception of peer influence."[9] Newring explained, "[I]t's not just my peers told me I need to drink, but I hold the belief that my peers expect me to drink." Newring related this to Nollen and his codefendant, Smith, opining that neither of them had a plan with respect to Mary Jo, but that both went along with what they thought was expected of them.

### (iv) Ability to Appreciate Risks and Evaluate Consequences

Newring testified that although juveniles may be able to identify risks and consequences, they may be unable to balance risks and rewards the same way a fully formed adult would. As to Nollen's ability to appreciate risks and consequences, Newring reported:

---

[9] See *Miller v. Alabama, supra* note 1.

[Nollen]'s plan was poorly-conceived, and he clearly demonstrated an inability to assess the risk and likely outcomes of his actions; each decision point led him to cho[o]se the next immediate solution that was availed to him. After he was committed to the robbery, each poor decision further compounded his error, leaving him with no (at the time) readily perceptible alternative.

### (v) Intellectual Capacity

As for Nollen's intellectual capacity, Newring testified that Nollen's intellectual deficits at the time of the crime impacted his ability to generate solutions and articulate his needs. Newring noted a relative deficit in Nollen's verbal intelligence, which he attributed to Nollen's adverse childhood experiences.

At the resentencing hearing, Newring was confronted with the statement made by the competency evaluator in 1983 that had Nollen been 18, the evaluator would seriously consider a diagnosis of antisocial personality disorder. Newring testified that back in 1983, it was believed that when a subject's performance score exceeded his or her verbal score by a certain number (as Nollen's did by 11), such a differential was indicative of individuals who act out frustrations, such as sociopaths and juvenile delinquents. Newring explained current research shows that poor verbal scores can instead be linked to adverse childhood experience. He explained that children enduring trauma must focus more on day-to-day survival and adapting to stress rather than building the neuroconnections that allow verbal skills to be strengthened. Newring testified that Nollen's scores were consistent with those of a person who had a history of childhood abuse, neglect, and trauma.

### (vi) Risk Assessment

Newring testified that Nollen is "low risk" for future acts of violence, is less likely than the average male in the community to have psychopathy, and suffers from no major health disorder. Newring noted that the clinical violent

offender review team at DCS recommended no further treatment for Nollen.

Newring also testified that Nollen was "low risk" for recidivism in terms of a sex offense. This assessment was based on Nollen's scores from two different instruments. However, Newring admitted that Nollen was at a higher risk of recidivism compared to men in the general population. He explained that this was because Nollen had been adjudicated and that after 10 years, Nollen's assessed risk for reoffense will be equal to the community level. Newring also noted that although the inpatient sex offender program's clinical review team is "very conservative and tend[s] to overrecommend treatment," in Nollen's case, the team recommended no further treatment.

On cross-examination, Newring was asked if he recalled seeing a report from 1988 that indicated Nollen had rape fantasies about prison staff. Newring responded that he recalled "discussions of sexual fantasies involving staff, and typically at the time staff would have referred to that as rape fantasies because it couldn't be a consensual act." Newring testified that he and Nollen had discussed Nollen's romantic fantasies and that none of the fantasies were exploitive, aberrant, or unusual. Additionally, after conducting an assessment to identify atypical or disordered sexual behavior and paraphilic interests, Newring reported that Nollen's scores were generally within normal limits.

### (vii) Newring's Conclusion

In his report, Newring concluded:

[T]he acts that led to . . . Nollen's conviction are rooted in his history of adverse childhood experience, emotional avoidance, substance abuse, poor school achievement, and seeking the approval of antisocial peers. His actions were the result of impulsive adolescent-decision-making, in which he failed to consider the negative outcomes, and compounded each reckless decision with an even worse decision, ultimately resulting in the death of his victim. . . . Nollen has appreciated a benefit from his

incarceration. The undersigned can find no barriers to
. . . Nollen's positive reintegration to society, should . . .
Nollen be afforded such an opportunity.

### 3. Disposition

Before announcing Nollen's sentence, the district court
stated that it considered the mitigating factors set forth in
§ 28-105.02, Nollen's presentence report, and the evidence
adduced by the State and by Nollen. The court then stated:

I thought long and hard about this and the difficulty I
have is the premeditation that took place over a several-
hour period.

And I understand your argument, . . . but there were
thoughts of this several hours earlier as they were in the
basement of the donut shop and it causes me great con-
cern in this case.

Premeditation means a design formed to do something
before it's done. Certainly there was a plan to burglarize,
that was the day before. Then there was an initial discus-
sion between the two of you in the basement where you
were talking about having sexual intercourse with her,
and there were comments made that if you did that she
would have to be killed to keep her quiet. . . .

. . . .

The evidence, which primarily came from statements
made by you, is clear that over a several-hour period you
had numerous opportunities to avoid the final decision to
murder [Mary Jo].

In determining what sentence ought to be imposed
upon the defendant, this Court has considered the nature
and circumstances of the crime, the history and character
and condition of the defendant, including the defendant's
age, mentality, education, experience, and social and cul-
tural background, all as back on January 11th, 1983, the
date of the original offense.

The Court also considered the lack of a previous crimi-
nal record of you. I considered the motivation for the

offense, as well as the nature of the offense and the violence involved in the commission of the crime.

. . . .

The Court finds that imprisonment is necessary because the offender is in need of correctional treatment that can be provided most effectively by a commitment to a correctional facility, and a lesser sentence will depreciate the seriousness of the offender's crime or promote disrespect for the law.

The Court recognizes and acknowledges the statements that you make today. The Court also recognizes and acknowledges the efforts that you've made to improve yourself over the last 33 years of incarceration.

I'm also acknowledging and recognizing that you were 17 years old at the time of the murder and I also recognize and acknowledge the mitigating qualities of youth and your troubled family life as testified to by . . . Newring, which includes the frontal — prefrontal cortex development of youth, and I recognize all of that and the science that goes with that. I recognize those as mitigating factors.

As an aggravating factor however, . . . the manner in which [Mary Jo] was abducted, abused, and terrorized over a significant period of time prior to her death and your utter disregard at that time for her life and the manner of her death shows a depravity and callousness which even to this day is chilling to contemplate.

The court then sentenced Nollen to 90 years' to life imprisonment. Nollen appeals this sentence.

After Nollen filed his brief on appeal, he also filed a motion requesting that this court either remand the cause or allow for supplemental briefing. The basis for Nollen's request was that both parties had argued their positions under the assumption that the current good time law would apply and that Nollen would be parole eligible at age 62. However, DCS has apparently recalculated Nollen's parole eligibility according to the 1983 good time law, which would make Nollen parole eligible

at age 78. In his motion, Nollen argued that this age difference for parole eligibility may affect our decision as to the constitutionality of his sentence and that the parties should be allowed an opportunity to argue which good time law should apply. We overruled Nollen's request for a remand, but sustained the motion for supplemental briefing.

### III. ASSIGNMENTS OF ERROR

Nollen assigns, reordered and restated, that the district court erred in imposing a sentence that (1) constitutes a "de facto life sentence" in violation of the 8th and 14th Amendments to the U.S. Constitution and of article I, §§ 9 and 15, of the Nebraska Constitution and (2) is unconstitutionally disproportionate to Nollen's offense in light of his age, age-related characteristics, and proven reform. Nollen also assigns that (3) the district court denied him due process by imposing his sentence without demonstrating "[m]eaningful [c]onsideration to [h]is [a]ge or [a]ge-[r]elated [c]haracteristics."[10]

### IV. STANDARD OF REVIEW

[1,2] Whether a sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment presents a question of law.[11] When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling.[12]

### V. ANALYSIS

All three of Nollen's assignments of error relate to his sentence. Nollen tells us that in order to decide the constitutionality of his sentence, we must first determine his parole eligibility date, i.e., whether the current good time law or the 1983 good time law applies.

---

[10] Brief for appellant at 25.

[11] See *State v. Mantich*, 287 Neb. 320, 842 N.W.2d 716 (2014).

[12] *State v. Sims*, 277 Neb. 192, 761 N.W.2d 527 (2009); *State v. Davis*, 276 Neb. 755, 757 N.W.2d 367 (2008).

### 1. GOOD TIME LAW

[3,4] We note that this same issue concerning good time law presented itself in *State v. Smith*.[13] In *Smith*, we cited *State v. Schrein*[14] for the proposition that the good time law to be applied to the defendant's sentence is the law in effect at the time the defendant's sentence becomes final. A defendant's sentence becomes final on the date that the appellate court enters its mandate concerning the defendant's appeal, if there is indeed an appeal.[15] If no appeal is taken from the judgment, that judgment becomes final.[16] In *Smith*, we concluded that the sentence the defendant received in 1983 could not become final in 1983 because it was unconstitutional and void, and therefore constituted "no sentence."[17] Accordingly, we concluded that the defendant's new, valid sentence would become final on the date we issued the mandate concerning his appeal and that therefore, the current good time law applied to his sentence.

[5] Although *Smith* was decided within the framework of a habeas corpus proceeding, its principle applies to this postconviction action because Nollen's sentence is also unconstitutional and void.[18] In *Montgomery v. Louisiana*,[19] the U.S. Supreme Court held that a sentence imposed in violation of a substantive constitutional rule is not merely erroneous, but void. This was the case with Nollen's original sentence, which was imposed pursuant to a statute later found to be unconstitutional as applied to Nollen.[20] Although Nollen's

---

[13] *State v. Smith, supra* note 5.

[14] *State v. Schrein*, 247 Neb. 256, 526 N.W.2d 420 (1995).

[15] See *id*.

[16] See *id*.

[17] *State v. Smith, supra* note 5, 295 Neb. at 957, ___ N.W.2d at ___.

[18] See *Montgomery v. Louisiana*, ___ U.S. ___, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016).

[19] *Id.*

[20] See *Miller v. Alabama, supra* note 1.

original sentence is void under the circumstances in this case, we note that the result may be different where a sentence is imposed pursuant to a *procedural* error later found to be unconstitutional. Then, such sentence is not automatically invalidated.[21]

The State does not address the impact of Nollen's sentence's being void, but, rather, contends that Nollen's sentence became final in 1983 and that the issue is controlled by *Duff v. Clarke*.[22] We disagree with the State.

*Duff* involved a defendant who was originally sentenced in 1988 to 12 to 20 years' imprisonment for first degree sexual assault of a child. While he was serving his sentence, the Convicted Sex Offender Act[23] was enacted, as well as a new good time law. In 1992, he elected to be resentenced pursuant to § 29-2934(4) (Cum. Supp. 1994) of that act. Upon reviewing an updated presentence investigation, the district court ordered the defendant to continue serving the remainder of his original sentence. He filed a motion for declaratory judgment seeking a determination that the new good time law applied to his "new" sentence. On appeal, we affirmed the district court's determination that the 1988 good time law applied to his sentence. We held that the good time law applicable at the time an offender starts serving his sentence controls good time computation regardless of whether the offender is resentenced pursuant to the Convicted Sex Offender Act.

The facts in *Duff* are clearly distinguishable from the facts presented here. Therein, the original sentence was not unconstitutional, nor was it void. Instead, the defendant merely elected to be resentenced pursuant to the Convicted Sex Offender Act. This election in 1992 did not change the finality of the sentence imposed in 1988. On the other hand, herein, Nollen's original sentence, imposed in 1983, is void

---

[21] *Montgomery v. Louisiana, supra* note 18.

[22] *Duff v. Clarke*, 247 Neb. 345, 526 N.W.2d 664 (1995).

[23] See Neb. Rev. Stat. §§ 29-2922 to 29-2936 (Reissue 2016).

and unconstitutional.[24] As we explained in *Smith*, a void sentence is no sentence.[25] Because Nollen's 1983 sentence is "no sentence," it cannot be said that his sentence became final in 1983. Instead, his sentence will become final on the date that this court enters its mandate concerning this appeal.[26] As such, the current good time law applies to Nollen's sentence and he will be parole eligible at age 62.

## 2. NOLLEN'S SENTENCE

[6,7] Before proceeding to Nollen's arguments about his sentence, we first set forth the law on juvenile sentencing. In *Graham*, the U.S. Supreme Court held that it is unconstitutional for a State to impose a sentence of life imprisonment without parole on a juvenile convicted of a nonhomicide offense.[27] The *Graham* Court explained that the Constitution requires that those juvenile offenders be given "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."[28]

[8] Two years later, in *Miller*, the Court declined to extend that categorical bar of no life-without-parole sentences to juveniles convicted of homicide.[29] Although the possibility of a life-without-parole sentence for a juvenile was not foreclosed, the Court said that a sentencer must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."[30] The Court had explained that a lifetime in prison is

---

[24] See, *Montgomery v. Louisiana, supra* note 18; *Miller v. Alabama, supra* note 1.

[25] See *State v. Smith, supra* note 5.

[26] See, *id.*; *State v. Schrein, supra* note 14.

[27] *Graham v. Florida, supra* note 2.

[28] *Id.*, 560 U.S. at 75.

[29] *Miller v. Alabama, supra* note 1. See *State v. Mantich*, 295 Neb. 407, 888 N.W.2d 376 (2016).

[30] *Miller v. Alabama, supra* note 1, 132 S. Ct. at 2469.

a disproportionate sentence for all but the rarest of children, those whose crimes reflect "'"'"irreparable corruption."'"'"[31]

In response to *Miller*, the Legislature amended Nebraska's sentencing laws for juveniles convicted of first degree murder.[32] Rather than imposing a mandatory sentence of life imprisonment, the sentencing scheme now provides that juveniles convicted of first degree murder are to be sentenced to a "maximum sentence of not greater than life imprisonment and a minimum sentence of not less than forty years' imprisonment."[33] In determining the sentence, the sentencing judge must "consider mitigating factors which led to the commission of the offense."[34] Section 28-105.02(2) sets forth a nonexhaustive list of mitigating factors for the court to consider.

### (a) Application of *Graham* and *Miller*

Nollen first argues that his sentence is unconstitutional because it does not allow him parole eligibility until age 62 and therefore denies him a "meaningful opportunity to obtain release" under *Graham*.[35] Although we have recently held that such a sentence *does* provide a meaningful opportunity for release,[36] we note that the Constitution does not require that Nollen be afforded such an opportunity.

[9] Nollen further argues that he is entitled to the "meaningful opportunity" requirement because felony murder is a nonhomicide offense. However, we recently decided *State v. Mantich*,[37] wherein we held that felony murder is a homicide

---

[31] *Montgomery v. Louisiana, supra* note 18, 136 S. Ct. at 726.

[32] *State v. Garza*, 295 Neb. 434, 888 N.W.2d 526 (2017). See, also, § 28-105.02.

[33] § 28-105.02(1).

[34] § 28-105.02(2).

[35] *Graham v. Florida, supra* note 2, 560 U.S. at 75.

[36] See *State v. Smith, supra* note 5.

[37] *State v. Mantich, supra* note 29.

offense for purposes of Eighth Amendment sentencing analysis. Accordingly, Nollen's sentence is governed by *Miller*.

Under *Miller*, as stated above, a juvenile offender convicted of a homicide offense may be sentenced to life imprisonment without parole so long as the sentencer considered specific, individualized factors before handing down that sentence.[38] Here, Nollen was sentenced not to life imprisonment without parole, but to imprisonment for a term of years that allows for parole eligibility. Furthermore, the district court considered the traditional sentencing factors, along with the mitigating factors set forth in § 28-105.02(2). We conclude that Nollen's sentence does not violate *Miller* and that therefore, Nollen's first assignment of error is without merit.

### (b) Proportionality

[10] Nollen next assigns that his sentence was disproportionate in light of his age and age-related characteristics. We disagree. The Eighth Amendment does not require strict proportionality between crime and sentence, but, rather, forbids only extreme sentences that are "grossly disproportionate" to the crime.[39] In this case, Nollen abducted, raped, and terrorized Mary Jo over a significant period of time prior to her death. The evidence suggests that she was conscious with her arms tied behind her back as the car sank into the ice-cold Missouri River. On these facts, Nollen's sentence was not disproportionate, and his second assignment of error is without merit.

### (c) Procedural Safeguards

Finally, Nollen assigns that he was denied due process because the sentencing court failed to "[d]emonstrate [m]eaningful [c]onsideration to [h]is [a]ge or [a]ge-[r]elated [c]haracteristics"[40] and failed to use adequate procedural

---

[38] *Miller v. Alabama, supra* note 1. See, also, *State v. Mantich, supra* note 11.

[39] *Ewing v. California*, 538 U.S. 11, 23, 123 S. Ct. 1179, 155 L. Ed. 2d 108 (2003). See, also, *State v. Mantich, supra* note 29.

[40] Brief for appellant at 25.

safeguards when sentencing him. We discuss each of these assertions separately and find both to be without merit.

First, we disagree that the sentencing court failed to demonstrate meaningful consideration of mitigating factors, such as Nollen's age-related characteristics. Conversely, before it announced Nollen's sentence, the district court stated:

> The Court recognizes and acknowledges the statements that you make today. The Court also recognizes and acknowledges the efforts that you've made to improve yourself over the last 33 years of incarceration.
>
> I'm also acknowledging and recognizing that you were 17 years old at the time of the murder and I also recognize and acknowledge the mitigating qualities of youth and your troubled family life . . . .

As an aggravating factor, however, the district court recalled the manner in which Nollen terrorized Mary Jo prior to her death. The district court found that Nollen's "utter disregard at that time for her life and the manner of her death shows a depravity and callousness which even to this day is chilling to contemplate."

[11] The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observations of the defendant's demeanor and attitude and all of the facts and circumstances surrounding the defendant's life.[41] We have reviewed the record and reject Nollen's claim that the district court did not adequately consider his age and age-related characteristics when sentencing him.

We also disagree that the district court failed to use adequate procedural safeguards when sentencing Nollen. Just as the defendant did in the recent case *Mantich*,[42] Nollen asks this court "to establish more precise procedural safeguards to ensure that sentences imposed on juveniles do not exceed

---

[41] *State v. Garza, supra* note 32; *State v. Timmens*, 263 Neb. 622, 641 N.W.2d 383 (2002).

[42] *State v. Mantich, supra* note 29.

constitutional limitations and to facilitate meaningful review by this Court."[43] Specifically, Nollen asks that we "require trial courts to make findings regarding whether a juvenile killed or intended to kill, whether his offense reflects irreparable corruption or transient immaturity, or whether some other penological interest requires a sentence akin to life without parole."[44] After considering almost the same argument in *Mantich*, this court declined to adopt any new procedural safeguards after concluding that our current sentencing procedures for juveniles who have committed homicide offenses is consistent with *Miller* and the Eighth Amendment as it is currently interpreted by the U.S. Supreme Court.[45] We reach the same conclusion here, and we find that Nollen's argument is without merit.

## VI. CONCLUSION

The sentence of the district court is affirmed.

AFFIRMED.

---

[43] Brief for appellant at 30.

[44] *Id.* at 31.

[45] *State v. Mantich, supra* note 29, 295 Neb. at 417, 888 N.W.2d at 383. See *Miller v. Alabama, supra* note 1.