IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. MATHIASEN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

AUSTIN L. MATHIASEN, APPELLANT.

Filed February 27, 2024.    No. A-22-913.

Appeal from the District Court for Douglas County: JEFFREY J. LUX, Judge. Affirmed.

Gregory A. Pivovar for appellant.

Michael T. Hilgers, Attorney General, and P. Christian Adamski for appellee.

PIRTLE, Chief Judge, and MOORE and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Following a jury trial in the Douglas County District Court, Austin L. Mathiasen was convicted of first degree sexual assault and was sentenced to 40 to 45 years' imprisonment. He was also subject to lifetime registration under the Nebraska Sex Offender Registration Act (SORA), Neb. Rev. Stat. § 29-4001 et seq. (Reissue 2016). Mathiasen appeals his conviction and sentence, claiming there was insufficient evidence to support his conviction, his sentence was excessive, and his sentence constituted a cruel and unusual punishment under the Eighth Amendment of the United States Constitution. We affirm.

## II. BACKGROUND

### 1. CHARGING DOCUMENTS

On August 24, 2021, the State filed a complaint in the county court of Douglas County charging Mathiasen with one count of first degree sexual assault pursuant to Neb. Rev. Stat.

§ 28-319(1)(a) (Cum. Supp. 2022), a Class II felony. The case was bound over to the district court and the State filed an information charging Mathiasen as set forth in the initial complaint. On May 24, 2022, the State filed an amended information, correcting the date of the offense, but maintaining the original charge.

## 2. TRIAL

Trial was held over 4 days in 2022: August 31, September 1, 2, and 6. Testimony was heard from law enforcement officers, a sexual assault nurse examiner, a forensic technician, a DNA analyst, the victim C.S., another resident from C.S.' apartment building, and Mathiasen. Numerous exhibits were received into evidence, including photographs, surveillance footage, a sexual assault evidence collection kit, and a DNA analysis report. Since Mathiasen acknowledged in his own testimony that he had sexual intercourse with C.S., which he claimed was consensual, we primarily set forth the evidence relevant to Mathiasen's claim that the evidence was insufficient to find him guilty of first degree sexual assault.

### (a) C.S.' Testimony

C.S. testified that on July 25, 2020, she had been living in an apartment on her own for "six and a half, seven months." She had been asleep but woke up because "there was no air conditioning in the apartment building" and it was particularly hot that night, "so [she] went down to get some fresh air." She went to the courtyard at the front of the building at about 2:50 a.m. Norman Gamble, a fellow resident and the "keeper for the building," was outside and they engaged in conversation. An individual, who she later identified as Mathiasen, approached them and asked Gamble if he could use the restroom. Gamble declined to let Mathiasen into the apartment because "he didn't feel like going upstairs at the time." While Mathiasen and Gamble were speaking, C.S. decided to go back inside. As she was walking towards the building, Mathiasen asked her if he could use her bathroom. C.S. initially declined, telling him, "I don't know you like that." Gamble then "chimed in and said, 'He's cool,' to let him use the bathroom." C.S. allowed Mathiasen into the building with her. On cross-examination, C.S. acknowledged that there were bathrooms in the lobby of the building, but stated they were locked at night.

When C.S. and Mathiasen entered her apartment, she directed him to the bathroom, which was connected to her bedroom. While Mathiasen was using the restroom, she laid on her bed because she was experiencing back pain related to a history of numerous back surgeries. She was lying on her stomach when she heard Mathiasen exit the bathroom. She did not see him because she was lying with her head down in her arms. Within a couple seconds, Mathiasen jumped on her, straddling her lower back. Mathiasen held her shoulders down with his hands, preventing her from getting up. She attempted to push herself up, but Mathiasen then held her arms down at her side, making it more difficult for her to resist.

C.S. pleaded with Mathiasen to get off her, but he did not stop and instead began pulling her shorts down. She resisted his efforts by holding on to her shorts, but Mathiasen was eventually able to bring them down to her knees. Mathiasen was not able to remove her underwear, so he pulled them to the side and inserted his penis in her anus and began "thrusting in and out." C.S. began screaming and pleaded for him to stop. She described the penetration as "[e]xtremely

painful" and that it "felt like [her] insides were just ripping." As Mathiasen penetrated her anus, he said "very derogatory things" to her.

C.S. said that she "blacked out" while Mathiasen was anally penetrating her. When she regained consciousness, Mathiasen was vaginally penetrating her. She told him that she was in pain and was "crying and pleading for him to stop," but "[h]e just kept on." Eventually, he told her that "he was done and got off [her] and then went into the bathroom." When he removed himself from her, C.S. "was numb" and "couldn't move." She stayed in her bed because she was "too scared to move." Mathiasen put on his clothing and threatened that "if [she] called the police . . . he would kill [her]." He then left the apartment.

C.S. then pulled her shorts up and went to her door. Through the peephole in her door, she observed Mathiasen enter the elevator. She then "came out and went to the window and saw him walk out of the front of the building" and enter his vehicle. C.S. then reentered her apartment. She felt "dirty and nasty, so [she] took off [her] clothes and got in the shower." While showering, she saw blood in the water and realized her anus was bleeding. After showering, she put on clean clothes and returned to her bed and cried because she was scared and "didn't know what to do." When asked if the incident began as a consensual sexual encounter, C.S. responded, "No, not at all." On cross-examination, C.S. estimated that Mathiasen was in her apartment for "[t]hree and a half to four hours." She stated that the assault began immediately. When asked "what happened the other three [to] four hours," she responded that she was sexually assaulted the entire time and that she did not know how long she had lost consciousness.

C.S. stayed in bed and cried that day. On cross-examination, C.S. could not recall what she did during the afternoon on the day of the assault. She did not attempt to contact or speak with anyone until her neighbor invited her over that evening for a meal. When C.S. went to her neighbor's apartment, she confided in her neighbor about the sexual assault. C.S. called 911 after her neighbor urged her to report the incident. Law enforcement officers arrived that night and spoke with C.S. and Gamble, had a crime lab technician collect photographs and other evidence from C.S.' apartment, and advised C.S. to go to the hospital. After going to the hospital, C.S. went to a domestic violence shelter and only returned to her apartment once, with a police escort, to retrieve her belongings. She stayed at the shelter for 3 weeks, until she found a new place to live.

(b) Norman Gamble, Sr.'s Testimony

Norman Gamble, Sr., testified that he was the "key keeper" for the apartment building. Among other duties, he would unlock the bathrooms in the morning because they were locked at 10 p.m. He remembered being outside talking with C.S. on the morning of July 25, 2020, when Mathiasen approached them. He knew Mathiasen because Mathiasen had a "female friend that lived there" and "he stayed there sometimes," however, Gamble only knew him as "Savage" at that time. Gamble confirmed that Mathiasen first asked him if he could use his restroom, and when Gamble told Mathiasen he was not going back in the building at that time, Mathiasen asked C.S. When C.S. responded, "'I don't know you like that,'" Mathiasen asked Gamble to "[t]ell her . . . I'm cool." Gamble said, "'Well, yeah. He's cool. He used to live here,'" meaning "he'd be in and out of the building" and had friends there. Gamble then saw C.S. and Mathiasen enter the building. Gamble moved out of the apartment building in April 2021 because he did not "feel it was safe

- 3 -

enough for [him] to live in"; that it was common to hear yelling and screaming and that it was so common that sometimes people ignored that type of behavior.

On cross-examination, when asked about the soundproofing in the apartments and whether it was "easy to hear what was going on in the next apartment," Gamble responded affirmatively. When asked "if there was screaming going on, you'd hear it," he responded, "You'd hear it."

### (c) Anne Boatright's Testimony

Anne Boatright testified that she was a sexual assault nurse examiner and that she completed a sexual assault evidence collection kit for C.S. at the hospital on July 25, 2020. In accordance with standard procedure, Boatright photographed the injuries C.S. sustained from the assault. The photographs were received into evidence. Boatright said that there were many significant tears on C.S.' anus. Boatright documented thirteen large tears but stated that there were "so many micro-tears that [she] couldn't count all of them." Photographs of C.S.' vagina also showed "diffuse redness." According to Boatright, C.S.' injuries were "consistent with forcible penetration," and loss of consciousness related to pain during a sexual assault "happen[s] kind of frequently." She stated that "[w]hen someone experiences painful sexual assault, they can disassociate, because parts of their brain shut off related to the trauma." Boatright stated that C.S. did not indicate she had experienced memory loss "related to drug-facilitated sexual assault."

### (d) Law Enforcement Testimony

#### (i) Detective Shannon Knuth

Detective Shannon Knuth worked for the Adult Sexual Assault Unit at the Omaha Police Department. Detective Knuth interviewed C.S. in September 2020 for "approximately 33 minutes." The detective described C.S. as "very emotional," but she was cooperative and described "everything that did occur that day." The interview was "audio-video recorded." At that time, they did not have a name for a "suspect" or "person of interest." However, because they had "video of the suspect entering and exiting [C.S.'] apartment, which gave [them] a very good still photograph," they were able to complete a bulletin that was then disseminated to law enforcement in the surrounding area to see if anyone recognized the person. Exhibits 41 and 42 are copies of the "stills" taken from the video surveillance that were used in the bulletin. It was not until April 2021 that a crime analysis team identified Mathiasen as a possible suspect based off a video from an unrelated case. At that point, a "photo lineup" was created, which included a photo of Mathiasen and five "random other individuals." Another detective with no knowledge of the case then presented the photo lineup to C.S. and she recognized Mathiasen. Detective Knuth created a "locate," which contained a photograph and some information, including a brief description of why law enforcement was interested in speaking to that person.

Detective Knuth subsequently had contact with Mathiasen at the police station in August 2021. The detective informed Mathiasen that they were investigating a sexual assault and asked him to consent to a buccal swab to compare with DNA in the sexual assault kit. Mathiasen refused consent at that time, but asked if he could do that in front of his parents. The detective obtained a telephone number and address from Mathiasen and arranged to meet him the next day at his parents' house at 1 p.m. Detective Knuth also sought a buccal swab warrant to "take his DNA."

- 4 -

When the detective called Mathiasen the next morning to confirm their meeting, it was discovered that the phone number provided by Mathiasen was not a valid number. Mathiasen was not at the arranged meeting place when Detective Knuth and another detective arrived "just shy" of 1 p.m. Detective Knuth recalled having a "pretty lengthy conversation" with Mathiasen's parents, and as the detectives were leaving the neighborhood, maybe "15, 20 minutes later," Mathiasen pulled into the parking lot. Detective Knuth pulled in behind Mathiasen's vehicle and observed that "he was a bit surprised that I showed up." When asked to consent to the buccal swab, Mathiasen refused and attempted to go inside the residence. Detective Knuth advised Mathiasen there was a "warrant for his DNA," at which point Mathiasen asked "to go into the residence in order to do that." The buccal swabs were packaged and taken to a "UNMC lab technician."

### (ii) Lieutenant Tara Ackerson

Lieutenant Tara Ackerson worked in the Special Victims Unit at the Omaha Police Department. In the summer of 2020, she was a sergeant with the Adult Sexual Assault Unit. She was involved in obtaining video surveillance from the apartment building where C.S. lived, specifically the apartment lobby and the floor where C.S.' apartment was located. Exhibit 44 contained six short video clips with different angles showing C.S. and Mathiasen on July 25, 2020, in the apartment lobby (3:18 a.m.) and then entering C.S.' apartment (3:19 a.m.), and Mathiasen leaving C.S.' apartment (6:44 a.m.).

On cross-examination, Lieutenant Ackerson acknowledged observing C.S. on a lengthier version of the video leaving her apartment and getting on the elevator 11 minutes after Mathiasen left. The lieutenant did not have the video of the apartment lobby for that time in the morning, so she was unable to know whether either Mathiasen or C.S. left the building.

### (e) Mathiasen's Testimony

Mathiasen testified regarding the events of July 25, 2020. He was familiar with C.S.' apartment building because he had been "in and out" of the building since 2017. He was driving his vehicle near C.S.' apartment building after leaving a friend's house at 3 a.m. and saw "a handful of people" in front of the building. Mathiasen parked his vehicle and spoke to some friends in the parking lot. He then walked from the parking lot to the courtyard where Gamble and C.S. were talking. Mathiasen asked Gamble to allow him to use the restroom in the building, but Gamble declined since he was not going back in the building. However, Gamble indicated that Mathiasen could use C.S.' bathroom. C.S. said "whatever" and rolled her eyes. She then smiled and they entered the building together. They engaged in friendly conversation while riding the elevator to C.S.' floor.

When they entered C.S.' apartment, Mathiasen used the restroom. When he exited the bathroom, he observed C.S. on her bed, sitting up with pillows behind her back. He claimed that she was not on her stomach. C.S. was watching a television show and indicated that Mathiasen could join her on the bed. C.S. then went to the bathroom for a few minutes and when she returned, he "could tell she put on some perfume type, smell good type." She returned to the bed and they had a discussion regarding television and movies. They began "playing footsie" and he rested his hand on her thigh. C.S. "moaned a little bit" and he began touching her breasts. She then touched

- 5 -

his penis through his clothing. At this point, he had been in her apartment for "about 40, 45 minutes."

Mathiasen then requested oral sex, which she declined to give him. He then asked C.S. to turn around and asked her to pull her shorts down. Since "[s]he couldn't pull them all the way down," Mathiasen "helped her." He took off most of his clothing, leaving on only his undershirt and socks. He said he vaginally penetrated C.S. for "about ten minutes," and also placed his thumb in C.S.' anus. When he subsequently asked her if he could penetrate her anally, she did not respond. He then began penetrating her anally for "three to five minutes" until he reached completion. He claimed that as he penetrated her, she "was panting with her mouth open" out of pleasure. He stated that the sexual intercourse took place for no longer than 20 minutes. Mathiasen testified that C.S. did not "say no" or tell him to stop at any point during the sexual encounter. When asked if the encounter "was a voluntary coupling between the two of [them]," he responded, "That is correct."

After cleaning his genitals in the bathroom, Mathiasen proceeded to put his clothing back on. On cross-examination, Mathiasen stated that there was "no blood on [him]" and "no blood stains on the bed." C.S. indicated to him she had not previously had anal sex before, nor had she previously engaged in sexual intercourse "with a person she just met on the first day." He told her that they could "keep this going on if she like[d]." At this point, he had been in the apartment for "roughly between an hour to an hour and a half." When asked what they did "for the other two hours," Mathiasen responded that they "[p]lopped back on the bed." He pulled her close to him and she laid her head on his chest. She asked him if he was in a relationship, and he informed her that he was not. She then asked him, "What do you think about us?" Mathiasen stated that "[r]ed flags started going off in [his] head immediately . . . but [he] told her yeah anyway." In an attempt to "get out of there without being rude," he told her that he was going to pick up food but that he would "be right back."

On cross-examination, Mathiasen remembered being interviewed by Detective Knuth on August 11, 2021, and that she informed him that she was investigating a sexual assault that took place at C.S.' apartment building on the 12th floor. She further told him the name of the accuser and that the allegations were that he asked to use C.S.' restroom, another resident vouched for him to convince C.S. to allow him to use her restroom, and that C.S. did not know him prior to the night of the alleged assault. He testified that even after being given this information during the interview, he did not know at that time what the detective was talking about.

On redirect, Mathiasen explained that he provided an incorrect telephone number to Detective Knuth because it was a new phone, but he "did give her the real address."

### (f) Jury Verdict and Sentence

After deliberation, the jury found Mathiasen guilty of first degree sexual assault and the district court entered judgment on the verdict. At a sentencing hearing held on November 7, 2022, the court sentenced Mathiasen to 40 to 45 years' imprisonment with 442 days' credit for time served. The court also found that Mathiasen was subject to lifetime registration under SORA "in that [Mathiasen] ha[d] a prior sex offense conviction which requires a lifetime registration." A written sentencing order was entered that same day.

## III. ASSIGNMENTS OF ERROR

Mathiasen assigns that (1) the district court erred in failing to grant a directed verdict and that there was insufficient evidence to support the jury's verdict, (2) the court abused its discretion by imposing an excessive sentence, and (3) the court imposed an unconstitutionally excessive sentence.

## IV. STANDARD OF REVIEW

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Cerros*, 312 Neb. 230, 978 N.W.2d 162 (2022); *State v. Pauly*, 311 Neb. 418, 972 N.W.2d 907 (2022).

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020).

Whether a sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment presents a question of law. *State v. Jones*, 297 Neb. 557, 900 N.W.2d 757 (2017). When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *Id*.

## V. ANALYSIS

### 1. DIRECTED VERDICT AND SUFFICIENCY OF EVIDENCE

At trial, Mathiasen motioned for a directed verdict at the close of the State's case in chief. The district court overruled Mathiasen's motion and the defense proceeded to call Mathiasen as a witness. On appeal, Mathiasen assigns that "the trial court erred when it failed to grant a directed verdict and there was insufficient evidence to support a jury verdict as to the charges." Brief for appellant at 5. A defendant who moves for dismissal or a directed verdict at the close of the evidence in the State's case in chief in a criminal prosecution and who, when the court overrules the dismissal or directed verdict motion, proceeds with trial and introduces evidence, waives the appellate right to challenge correctness in the trial court's overruling the motion for dismissal or a directed verdict but may still challenge the sufficiency of the evidence. *State v. Guzman*, 305 Neb. 376, 940 N.W.2d 552 (2020). We therefore address Mathiasen's assigned error as a challenge to the sufficiency of the evidence.

Section 28-319(1)(a) provides that a person commits the crime of first degree sexual assault if they "subject[] another person to sexual penetration . . . without the consent of the victim." It is undisputed that Mathiasen sexually penetrated C.S. Thus, the remaining question is whether a rational fact finder could have determined that the sexual penetration took place without the consent of C.S.

At trial, C.S. testified that the sexual penetration was not consensual. She said that Mathiasen jumped on her back and held her down as he removed her shorts and began anally

penetrating her, and that the penetration was extremely painful. She unsuccessfully resisted Mathiasen's efforts and cried, screamed, and pleaded for him to stop. As Mathiasen anally penetrated her, she lost consciousness. Boatright, a sexual assault nurse examiner explained that "[w]hen someone experiences painful sexual assault, they can disassociate, because parts of their brain shut off related to the trauma." When C.S. regained consciousness, Mathiasen was vaginally penetrating her. She cried and pled for him to stop, but "[h]e just kept on." According to C.S., before Mathiasen left, he threatened to kill her if she contacted law enforcement.

C.S. had significant injuries as a result of the anal penetration. Those injuries were documented by Boatright. Photographs received into evidence showed redness, blood clots, and tearing on C.S.' anus. Boatright stated that C.S. had thirteen large tears on her anus and that there were "so many micro-tears that [she] couldn't count all of them." According to Boatright, C.S.' injuries were "consistent with forcible penetration." C.S. further testified that, following the incident, she stayed at a domestic violence shelter until she found a new place to live and that she only returned to the apartment once with a police escort to collect her belongings.

A rational fact finder could have concluded from this evidence that the sexual penetration was not consensual.

Mathiasen contends, however, that "the evidence was so incredulous that no jury should have been able to find [him] guilty." Brief for appellant at 10. He dissects C.S.' version of events, noting that Gamble knew Mathiasen and if something untoward happened, he would be able to identify Mathiasen as the perpetrator. He further notes that he was seen looking towards the cameras in the surveillance footage and that he made no effort to conceal his identity. He asserts that "[i]f he was planning something illegal," he would have "had a hoodie on" and attempted to conceal his identity. *Id.* at 15. He also questions C.S.' timeline of events and her testimony that the assault took place over the course of 3 hours. He points out that she "decide[d] that she must have passed out, a fact which she conveniently fail[ed] to mention to the person doing her sexual assault evaluation." *Id*. at 16.

He further suggests that C.S.' testimony that she was lying down on her bed while Mathiasen was using the bathroom does not "comport with any idea of how someone would act when letting someone use their bathroom at 3:00 in the morning." *Id.* He also points to C.S.' testimony that she watched through the window in the hall as Mathiasen left, which he claims contradicts the testimony of Lieutenant Ackerson who described the surveillance footage showing C.S. leaving her apartment 11 minutes after Mathiasen left. Mathiasen further challenges that C.S. could not remember what she did for the rest of the day, aside from taking a shower and having a meal with a neighbor, who was "strangely absent from the trial despite being subpoenaed." *Id.* at 17. Mathiasen claims that he and C.S. had consensual sexual intercourse and that the "acts were regretted by both parties." *Id.* He claims he led C.S. to believe they might have a relationship in the future and C.S. decided that Mathiasen "would pay for his lack of honor" with a sentence of 40 to 45 years' imprisonment. *Id*.

While we acknowledge that Mathiasen testified to a version of events which conflicted with C.S.' version, it is not the role of this court to reweigh the evidence or otherwise make determinations regarding witness credibility. See *State v. Cerros, supra*. It is the role of the fact finder to make such determinations, and in this case the jury, as the fact finder, subscribed to the version of events presented by the State.

## 2. Excessive Sentence

Mathiasen claims the district court abused its discretion when it imposed an excessive sentence. Mathiasen was convicted of first degree sexual assault, a Class II felony. A Class II felony is punishable by a minimum of 1 year of imprisonment and up to a maximum of 50 years' imprisonment. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2022). The court sentenced Mathiasen to 40 to 45 years' imprisonment. Mathiasen's sentence is within the statutory range; as such, we review the court's sentencing determination only for an abuse of discretion.

When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *State v. Lierman, supra*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

Mathiasen was 34 years old at the time of sentencing. According to the presentence investigation report (PSR), Mathiasen was single and had two living children. He graduated from high school and completed some college courses. He was unemployed prior to his incarceration.

Mathiasen's adult criminal history dating back to 2006 includes a conviction for first degree sexual assault of a minor. At the time of that offense, he was 19 years old and impregnated a 12-year-old child. Mathiasen had a couple convictions for SORA violations, as well as convictions for burglary, domestic assault, a protection order violation, and more. A "Sex Offender Risk Intervention and Progress Scale" assessment showed that Mathiasen was at a high risk for reoffending.

According to the PSR, Mathiasen reported to the probation officer that he had a history of depression, anxiety, and drug use and had been previously diagnosed with ADHD and OCD. He had various traumatic experiences in his youth, including the loss of family members, physical abuse, and sexual abuse. He stated that he had "sexual issues from the abuse" and that he suffered from nightmares and suicidal ideation. On more than one occasion, he had "given into impulsive behaviors and aggression" resulting "in harm to others or destruction of property." He felt "people have something against him."

The PSR included a statement by Mathiasen. When the probation officer asked Mathiasen why he was there at the end of the interview, he stated, "They are trying to portray me as a monster." In his statement, Mathiasen insisted that he was innocent and reiterated the version of events he described at trial. He further stated that he believed C.S. "was caught in a bunch of lies." He stated that she testified she yelled and screamed, but "they were on one floor with 13 apartments," which meant that "if she had been screaming for help[,] someone would have heard her." He stated that he had "been going in and out" of C.S.' apartment building since 2007 and was aware the building's cameras were operational. He questioned why he would "commit a crime just to be caught on the cameras." He believed he "got played through all of this" and that "his attorney didn't know anything."

The PSR also included a victim impact statement, wherein C.S. stated that Mathiasen's crime had a significant impact on her. She stated that she would "never be the same person [she]

was before" and that she now has "a lot of anxiety when it comes to being around men in general." She no longer had "the same kind of relationships with [her] male friends as [she] use[d] to" and felt the need to "continually watch [her] back when [she was] out alone." She had been seeing a counselor for the psychological impact of the crime and saw multiple doctors to address its physical impact. She urged the court to impose a sentence of imprisonment for "the maximum amount of time because [Mathiasen had] already done this crime to someone else and he chose to do it again to [her]." She did not want anyone else to experience what she had gone through.

The district court stated that it had received a letter from Mathiasen "a day or two after the trial," when, according to the court, Mathiasen was not "in the best of moods." The court noted that Mathiasen's letter asked the court for the death penalty. The court asked Mathiasen if he knew that was not an option in "this kind of case," to which Mathiasen replied, "I do now." The court asked if Mathiasen really wanted the death penalty, and Mathiasen responded that he did. The court questioned defense counsel on whether Mathiasen was competent to move forward with sentencing, and after further discussion between the court, the attorneys, and Mathiasen, the court concluded they could proceed to sentencing.

Mathiasen's counsel noted that Mathiasen had maintained his innocence during the entirety of the proceedings and that it would not be fair to hold that against him following his conviction. He informed the court that Mathiasen "would be hoping that the Court would consider something on the lower end . . . eight to ten years" for his sentence.

Mathiasen personally informed the district court he was "innocent," that he did not rape C.S., that he did not force himself on C.S., and that he "never threatened her." He stated that he "in no way, shape or form" hurt C.S., and that he did not know why she was "doing this." He said that "[i]t's just been a snowball effect." He stated that "[j]ustice [wa]sn't being served" and that the district court would be "taking [him] away from [his] kids" and it "just hurts."

The State informed the district court that it did not "begrudge or have any opinion regarding . . . Mathiasen maintaining that he's innocent," nor was it asking that the court "punish him additionally because he h[eld] that view." The State requested that Mathiasen be held "accountable for what the facts were on this case and what the jury finding was in th[e] case," which was that he was guilty of first degree sexual assault. The State noted that Mathiasen had previously been convicted of a sex offense and had a history of failing to comply with SORA. The State characterized Mathiasen as "a danger to society" and urged the court to sentence him to "a lengthy term of incarceration."

The district court stated that it had reviewed the contents of the PSR, Mathiasen's statement, and the parties' arguments and considered the factors set forth in Neb. Rev. Stat. § 29-2260 (Reissue 2016), as well as Mathiasen's "age, mentality, education and experience, social and cultural background, past criminal record and record of law-abiding conduct, the motivation for the offense, the nature of the offense and the amount, if any, of violence involved in the commission of the offense." The court found that the crime Mathiasen was convicted of was a registrable offense under SORA. The court further stated that it understood Mathiasen was "pushing [his] version of events" but that the case "was tried to a jury," who, as the finder of fact, found Mathiasen to be guilty. The court stated that it must determine his sentence based on the version of facts which the jury found. The court noted that Mathiasen had a prior conviction for a sex offense and found that "a sentence of probation would not be appropriate," and "would

depreciate the seriousness of the offense and would promote disrespect for the law." The court then sentenced Mathiasen as previously set forth.

In his brief on appeal, Mathiasen argues that the district court abused its discretion by "ignor[ing] th[e] law in imposing an excessive sentence." Brief for appellant at 19. He highlights that the PSR "paints a picture of a man who has been dealt a bad hand in life," had "[l]earning disabilities," and suffered "physical abuse[] and sexual abuse as a child." *Id.* He further points out that he had been the victim of a violent crime, struggled with substance abuse, and suffered from suicidal ideation. He argues that although his crime was serious, "the nearly maximum sentence d[id] not fit th[e] offender." *Id*. at 20.

Since the appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life, a sentencing court is accorded very wide discretion in imposing a sentence. See *State v. Rogers*, 297 Neb. 265, 899 N.W.2d 626 (2017). To the extent Mathiasen argues that the district court did not adequately consider certain mitigating factors, we note that it is evident that the court had before it all the information that Mathiasen suggests should have resulted in a lesser sentence. However, it was within the sentencing court's discretion to weigh more heavily the factors supporting a lengthier sentence, such as the seriousness of the offense and Mathiasen's history of similar criminal activity. We therefore cannot say the court abused its discretion in determining the sentence imposed.

### 3. UNCONSTITUTIONAL SENTENCE

Mathiasen further claims that the district court imposed a sentence which constituted a violation of his constitutional right to be free from cruel and unusual punishment. Mathiasen cites to case law related to the Eighth Amendment of the United States Constitution and claims that "the punishment imposed [was] disproportionate to the crime and [his] status." Brief for appellant at 21. He argues that he was "unfairly prejudiced by the inflammatory nature of the charges themselves and the Court did not impose a sentence consistent with the facts surrounding the case, and consistent with [Mathiasen]'s health, age, lack of criminal history, his possibility of recidivism[,] and his ability to be rehabilitated." *Id*. Further, he claims that "[i]t is more likely that incarceration will harden him as a criminal rather than rehabilitat[e] [him]." *Id*.

The Eighth Amendment prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed. *State v. Jones*, 297 Neb. 557, 900 N.W.2d 757 (2017). The U.S. Supreme Court has characterized this as a "narrow proportionality principle" which does not require strict proportionality between crime and sentence, but, rather, forbids only extreme sentences that are grossly disproportionate to the crime. See *Ewing v. California*, 538 U.S. 11, 123 S. Ct. 1179, 155 L. Ed. 2d 108 (2003) (citing *Harmelin v. Michigan*, 501 U.S. 957, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991)). See, also*, Lockyer v. Andrade*, 538 U.S. 63, 77, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003) ("[t]he gross disproportionality principle reserves a constitutional violation for only the extraordinary case").

Whether a sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment presents a question of law. *State v. Nollen*, 296 Neb. 94, 892 N.W.2d 81 (2017). When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *Id*.

As we previously discussed, Mathiasen's sentence was within the statutory limits for a Class II felony. See § 28-105 (maximum of 50 years' imprisonment for a Class II felony). An Eighth Amendment analysis generally respects legislative determinations of statutory sentencing limits. See *State v. Loschen*, 221 Neb. 315, 376 N.W.2d 792 (1985) (stating sentence of imprisonment within limits of valid statute ordinarily not cruel and unusual punishment in constitutional sense). For reasons already stated in response to Mathiasen's claim that his sentence is excessive, we conclude that his sentence was not grossly disproportionate to the crime and therefore does not violate his Eighth Amendment right to be free from cruel and unusual punishment.

## VI. CONCLUSION

For the reasons set forth above, we affirm Mathiasen's conviction and the sentence imposed by the district court.

AFFIRMED.