Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/18/2025 09:07 AM CDT

State of Nebraska ex rel. Michael T. Hilgers,
Attorney General of the State of Nebraska, appellee,
v. Robert B. Evnen, Secretary of State of the
State of Nebraska, appellant.

___ N.W.3d ___

Filed April 18, 2025.    No. S-24-221.

1. **Rules of the Supreme Court: Appeal and Error.** Parties who wish to secure appellate review must abide by the rules of the Nebraska Supreme Court, and those who fail to comply with the appellate briefing rules do so at their own peril.

2. **Appeal and Error.** Argument headings in an appellant's brief are not a sufficient substitute for a separately designated assignments of error section.

3. ____. Where an appellant's assignments of error are not properly designated and instead consist of headings or subparts of arguments and are not within a designated assignments of error section, an appellate court may proceed as though the party failed to file a brief, providing no review at all, or, alternatively, may examine the proceedings for plain error.

4. ____. When reviewing proceedings for plain error, an appellate court is not constrained by the specific arguments raised in the briefs, nor is it required to consider every error that may have occurred in the lower court.

5. ____. Courts should find plain error only in those rare instances where it is warranted, as opposed to invoking it routinely.

6. ____. Generally, an appellate court will find plain error only when a miscarriage of justice would otherwise occur.

7. **Jurisdiction: Appeal and Error.** Plain error review does not, and cannot, constrain an appellate court's duty to ensure that it has jurisdiction. Therefore, even when circumstances may warrant plain error review of the merits, an appellate court will analyze its jurisdiction using the same standard of review ordinarily applied to jurisdictional issues.

8. **Appeal and Error.** Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.

9. **Judgments: Jurisdiction: Appeal and Error.** When a jurisdictional issue does not involve a factual dispute, determination of a jurisdictional issue is a matter of law which requires an appellate court to reach a conclusion independent from the trial court's; however, when a determination rests on factual findings, a trial court's decision on the issue will be upheld unless the factual findings concerning jurisdiction are clearly incorrect.

10. **Moot Question: Jurisdiction: Appeal and Error.** Because mootness is a justiciability doctrine that operates to prevent courts from exercising jurisdiction, an appellate court considers mootness under the same standard of review as other jurisdictional questions.

11. **Jurisdiction: Appeal and Error.** Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.

12. **Standing: Jurisdiction: Declaratory Judgments: Parties.** A jurisdictional prerequisite for obtaining declaratory relief is that the parties must have a legally protectible interest or right in the controversy at issue.

13. **Standing: Jurisdiction: Parties.** Standing is a jurisdictional component of a party's case because only a party who has standing may invoke the jurisdiction of a court.

14. **Moot Question: Jurisdiction: Appeal and Error.** The question of mootness bears directly on appellate jurisdiction.

15. **Moot Question: Words and Phrases.** A case is moot if the facts underlying the dispute have changed, such that the issues presented are no longer alive.

16. **Moot Question.** A case becomes moot when the issues initially presented in litigation cease to exist or the litigants lack a legally cognizable interest in the outcome of litigation.

17. ____. The central question in a mootness analysis is whether changes in circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief.

18. **Statutes.** Even when the general saving statute in Neb. Rev. Stat. § 49-301 (Reissue 2021) is applicable, it relates to substantive and not procedural law.

19. ____. Substantive law commonly creates duties, rights, and obligations of a party, whereas a procedural law prescribes the means and methods through and by which substantive laws are enforced and applied.

20. **Constitutional Law: Statutes: Presumptions.** A statute is presumed to be constitutional, and all reasonable doubts are resolved in favor of its constitutionality.

21. **Constitutional Law: Statutes: Proof.** The burden of establishing the unconstitutionality of a statute is on the one attacking its validity.

22. **Constitutional Law: Statutes.** It is not the province of a court to annul a legislative act unless it clearly contravenes the constitution and no other resort remains.

23. **Constitutional Law: Criminal Law: Statutes.** A penal statute must be construed so as to meet constitutional requirements if such can reasonably be done.

24. **Sentences.** Commutation of punishment is substitution of a milder punishment known to the law for the one inflicted by the court.

25. **Sentences: Probation and Parole.** Parole and commutation are different concepts as a matter of law and serve different functions in the correctional process.

26. **Probation and Parole.** Parole is a regular part of the rehabilitative process.

27. **Constitutional Law: Legislature: Probation and Parole.** The conditions clause of Neb. Const. art. IV, § 13, permits the Legislature to enact laws placing conditions on when a committed offender is eligible for parole. A committed inmate must meet statutory requirements—i.e., "conditions"—before being considered eligible for parole. But once an inmate is eligible for parole, the Board of Parole alone has authority to grant parole—the Legislature has no power over the decision whether to grant release on parole.

28. **Probation and Parole.** When the Board of Parole places eligible offenders on parole status, those offenders are conditionally released from the custody of the Nebraska Department of Correctional Services, but they remain in the legal custody and control of the Board of Parole.

29. **Sentences: Probation and Parole.** Generally, granting parole status to a committed offender does not modify or reduce the sentence imposed; it merely changes the circumstances under which the sentence is being served.

30. **Legislature: Criminal Law: Public Policy: Sentences.** The Legislature declares the law and public policy by defining crimes and fixing their punishment.

31. **Sentences: Statutes: Time.** The good time scheme to be applied to a defendant's sentence is the law in effect at the time the defendant's sentence becomes final.

32. ____: ____: ____. The good time statutes in effect when an offender's sentence becomes final are considered an integral part of the sentence imposed.

33. **Sentences: Probation and Parole.** Whether applied prospectively or retrospectively, the new parole eligibility provisions in 2023 Neb. Laws,

L.B. 50, do not result in substituting a milder punishment for the sentence originally imposed.

Appeal from the District Court for Lancaster County: Susan I. Strong, Judge. Reversed.

Robert F. Bartle, of Bartle & Geier, for appellant.

Michael T. Hilgers, Attorney General, Zachary A. Viglianco, and Eric J. Hamilton for appellee.

Funke, C.J., Miller-Lerman, Cassel, Stacy, Papik, and Freudenberg, JJ., and Riedmann, Judge.

Per Curiam.

The Nebraska Attorney General filed this declaratory judgment action seeking a judicial determination that certain accelerated parole eligibility provisions in a criminal justice reform bill enacted in 2023[1] were unconstitutional. The Nebraska Secretary of State (Secretary) was named as a defendant pursuant to Neb. Rev. Stat. § 84-215 (Reissue 2014). The district court entered summary judgment in favor of the Attorney General and declared that the challenged provisions were unconstitutional. The Secretary appeals. For reasons we will explain, we reverse the declaratory judgment.

## I. BACKGROUND

### 1. Accelerated Parole Eligibility
### Under L.B. 50

L.B. 50 was a criminal justice reform bill passed in 2023 during the regular session and signed into law, with an effective date of September 2, 2023. This declaratory judgment action was filed a few months later and challenges the constitutionality of §§ 47, 48, and 57 of L.B. 50, which deal with parole eligibility. We summarize each section in turn.

---

[1] See 2023 Neb. Laws, L.B. 50.

### (a) § 47

Section 47 of L.B. 50 amended Neb. Rev. Stat. § 83-1,110(1) (Reissue 2014) to accelerate parole eligibility for certain offenders. As amended, § 83-1,110(1) (Reissue 2024) provides in relevant part:

> (1) Every committed offender shall be eligible for parole upon the earliest of the following:
>
> (a) When the offender has served one-half the minimum term of his or her sentence as provided in sections 83-1,107 and 83-1,108;
>
> (b) For a committed offender serving a maximum term of twenty years or less, two years prior to the offender's mandatory discharge date; or
>
> (c) For a committed offender serving a maximum term of more than twenty years, when the offender has served eighty percent of the time until the offender's mandatory discharge date.

Section 47 also amended § 83-1,110(3) (Reissue 2014) to address parole eligibility when committed offenders are sentenced to consecutive prison terms.

### (b) § 48

Section 48 of L.B. 50, now codified at Neb. Rev. Stat. § 83-1,110.05 (Reissue 2024), created a new category of "geriatric parole." Under § 48 of L.B. 50, committed offenders are eligible for "geriatric parole" if they are 75 years of age or older and have served at least 15 years of the sentence for which they are currently incarcerated.[2] Certain committed offenders are ineligible for geriatric parole, including those who are serving a sentence of life imprisonment; a sentence for either a Class I, IA, or IB felony; or a sentence for an offense that includes as an element sexual contact or sexual penetration.[3]

---

[2] § 83-1,110.05(1).

[3] § 83-1,110.05(1)(a).

Section 48 requires the Nebraska Department of Correctional Services (DCS) to "identify committed offenders who may be eligible for geriatric parole."[4] It also states that in deciding whether to grant geriatric parole, the Board of Parole shall review "the decision guidelines as set forth in the board's rules and regulations and the factors set forth in section 83-1,114."[5] Neb. Rev. Stat. § 83-1,114 (Reissue 2024), in turn, sets out the factors to be considered by the Board of Parole when determining whether any committed offender should be released on parole.

### (c) § 57

Section 57(5) of L.B. 50 amended Neb. Rev. Stat. § 83-1,135.02 (Reissue 2024) to include a new subsection, which states:

> (5) Except as otherwise provided in section 83-1,111.01, it is the intent of the Legislature that the changes made to sections . . . 83-1,110 [and] 83-110.05 . . . apply to all committed offenders under sentence or on parole on or after September 2, 2023, and to all persons sentenced on and after such date.

The parties refer to § 57 as the "retroactivity provision" of L.B. 50 because it reflects the Legislature's intent that the accelerated parole eligibility provisions in § 47, as well as the geriatric parole eligibility provisions in § 48, apply "to all committed offenders under sentence or on parole" on the effective date of the act.

For purposes of this declaratory judgment action, the parties have stipulated that the practical effect of applying L.B. 50's new parole eligibility provisions retroactively is that some committed offenders who were parole eligible prior to the effective date of L.B. 50, but who have not yet been granted parole, will get new, earlier parole eligibility dates. And some committed offenders who were not parole eligible prior to the

---

[4] § 83-1,110.05(2).

[5] § 83-1,110.05(3).

enactment of L.B. 50 either will become parole eligible as of L.B. 50's effective date or will receive a new, earlier parole eligibility date.

In this opinion, we will collectively refer to §§ 47, 48, and 57 as "L.B. 50's new parole eligibility provisions."

## 2. Attorney General's Opinion

On August 30, 2023, the director of DCS and the chair of the Board of Parole jointly asked the Attorney General for "a formal opinion" on whether L.B. 50's new parole eligibility provisions applied retroactively to offenders already under sentence and, if so, whether the provisions were unconstitutional. The Attorney General responded to the request in a letter dated September 6, 2023.

The Attorney General's letter opened by advising, "We read LB50 to likely have retroactive effect and view the law's retroactivity as a likely violation of Separation of Powers." The Attorney General's reasoning focused exclusively on §§ 47, 48, and 57 of L.B. 50.

The Attorney General opined that § 57 "likely qualifies" as a clear expression of legislative intent to apply the new parole eligibility provisions of §§ 47 and 48 retroactively. He further opined such retroactive application "would likely unconstitutionally empower the Board of Parole to change valid convictions after a final sentence of conviction [and it] therefore likely invades the province of both the Judiciary and the Board of Pardons." This was so, the Attorney General reasoned, because once offenders are placed on parole, they are entitled to accrue additional good time reductions under existing good time statutes,[6] which will accelerate their discharge. The Attorney General reasoned that by granting committed offenders "earlier parole" under L.B. 50, the "Board of Parole would be effectuating a commutation." Noting that the Board of Pardons, and not the Board of Parole, has the constitutional authority to grant commutations, the letter opined that L.B.

---

[6] See Neb. Rev. Stat. § 83-1,108(1) (Reissue 2024).

50 "likely unconstitutionally grants the Board of Parole the power of commutation."

Lastly, the Attorney General's letter addressed severability, phrasing the question as whether "section 57(5), to the extent it provides for sections 47 and 48 to apply retroactively, is severable from the rest of LB 50." It was the Attorney General's opinion that although L.B. 50 did not contain a severability clause, other factors weighed in favor of concluding the retroactivity provision in § 57 was "[l]ikely" severable from the remainder of L.B. 50.

### 3. DCS' Response to Opinion

In a memorandum addressed to the Attorney General and dated September 18, 2023, the DCS director acknowledged the Attorney General's September 6 letter and stated:

> In reliance [on] your analysis and determination that LB50 is likely to have retroactive effect, and your view that the law's retroactivity is likely an unconstitutional violation of the Separation of Powers, [DCS] will not be advancing to the Board of Parole committed offenders whose sentence of conviction became final prior to LB50's effective date (September 2, 2023) for determination of a new parole eligibility date . . . .

### 4. Declaratory Judgment Action

On October 18, 2023, the Attorney General filed this declaratory judgment action[7] in the district court for Lancaster County, Nebraska. Citing the provisions of § 84-215, the complaint named the Secretary as the only defendant. No other parties have intervened.

The Attorney General's complaint alleged that the DCS director "requested the Attorney General's advice on the constitutionality of LB50," and, in response, the Attorney General advised the director "in writing that certain provisions of LB50 were likely unconstitutional." Both the Attorney

---

[7] See, generally, Neb. Rev. Stat. §§ 25-21,149 to 25-21,164 (Reissue 2016).

General's letter and the director's responsive memorandum were attached to the complaint and incorporated therein. The complaint affirmatively alleged that the DCS director has a duty to implement certain provisions of L.B. 50 and had refused to do so "in reliance on the Attorney General's advice." The complaint prayed for an order

> [d]eclaring that the retroactive application of sections 47 and 48 of LB50 under section 57(5) of LB50 is unconstitutional because it invades the Board of Pardons' commutation power under Article IV, Section 13, of the Nebraska Constitution and impermissibly modifies final criminal sentences in violation of Article II, Section 1, of the Nebraska Constitution[.]

The Secretary employed special counsel to defend the action[8] and filed an answer admitting the complaint's factual allegations and the authenticity of the attachments thereto but denying the complaint's legal conclusions. The Secretary's answer prayed for "appropriate findings and conclusions" in the declaratory judgment action.

### 5. Summary Judgment

#### (a) Motions and Hearing

Shortly after the Secretary's answer was filed, the parties filed a joint stipulation of facts, as well as cross-motions for summary judgment. For purposes of summary judgment, they agreed to the following facts:

• On September 6, 2023, the Attorney General advised DCS and the Board of Parole "in writing that certain provisions of LB50 were likely unconstitutional."

• "Other than [the September 6, 2023,] writing, the Attorney General has not rendered any formal, written advice regarding the constitutionality of LB50 to any interested party."

---

[8] See § 84-215 (repealed by 2024 Neb. Laws, L.B. 287) (authorizing Secretary of State to "employ special counsel" for purpose of defending actions brought under statute).

• On September 18, 2023, the DCS director informed the Attorney General that he was refusing to implement the provisions of L.B. 50 retroactively "in reliance on the Attorney General's advice."

• L.B. 50's "retroactive effect would impact the parole eligibility of 1794 current offenders." The retroactive effect would impact the following: 529 committed offenders who were already parole eligible would have a new, earlier parole eligibility date; 345 committed offenders who were not yet parole eligible under prior law would be rendered parole eligible; and 920 committed offenders who had not yet reached their parole eligibility date would have a new, earlier parole eligibility date.

In addition to these facts, the parties' joint stipulation reflected their agreement that the Attorney General was authorized to bring this action pursuant to § 84-215 and other statutory and common-law authority and that the Secretary was named as a defendant in the action pursuant to § 84-215. The parties also purported to agree that the district court had jurisdiction to "hear this action and grant the requested relief."

At the hearing on the cross-motions for summary judgment, the court received the parties' joint stipulation, a copy of L.B. 50 as it appeared at final reading, a copy of L.B. 50's introducer's statement of intent, and a copy of the Judiciary Committee's L.B. 50 committee statement. The court heard arguments and took the matter under advisement.

### (b) Summary Judgment Ruling

In an order and judgment entered March 8, 2024, the district court first addressed several jurisdictional issues, after which it analyzed the parties' constitutional arguments. Ultimately, the court sustained the Attorney General's summary judgment motion and overruled the Secretary's motion. As relevant to the issues presented on appeal, we summarize the district court's reasoning.

### (i) Jurisdiction and Justiciability

The court noted that although the parties purported to stipulate to matters of jurisdiction and justiciability, such matters were legal determinations for the court to make.[9] When analyzing its authority to determine the constitutionality of L.B. 50's new parole eligibility provisions, the district court focused exclusively on the statutory procedure authorized by § 84-215, which, at the time, provided in relevant part:

> When the Attorney General issues a written opinion that an act of the Legislature is unconstitutional and any state officer charged with the duty of implementing the act, in reliance on such opinion, refuses to implement the act, the Attorney General shall, within ten working days of the issuance of the opinion, file an action in the appropriate court to determine the validity of the act. In any such action filed under the provisions of this section, the Attorney General may sue as defendant any person having a litigable interest in the matter or in lieu thereof may sue the Secretary of State. If the Secretary of State is named as defendant, it shall be his duty to defend such action and to support the constitutionality of the act of the Legislature and for such purpose is authorized to employ special counsel.

For purposes of its analysis under § 84-215, the court treated the Attorney General's letter as a "written opinion" on unconstitutionality, noting the letter advised DCS, in writing, that "L.B. 50 likely violates the Nebraska Constitution." The court further found that in reliance on that letter, the DCS director had refused to retroactively implement L.B. 50's new parole eligibility provisions and would not identify, or inform the Board of Parole about, committed offenders under sentence

---

[9] See, e.g., *Mann v. Mann*, 316 Neb. 910, 7 N.W.3d 845 (2024) (holding parties cannot confer subject matter jurisdiction upon judicial tribunal by either acquiescence or consent).

who became eligible for parole under L.B. 50's new parole eligibility provisions. [10]

Next, the court addressed the timeliness of the action under § 84-215. It noted that although the statute requires the Attorney General to file an action "within ten working days of the issuance of the opinion," [11] this action was filed roughly 6 weeks after the Attorney General's letter was written and 30 days after DCS notified the Attorney General that it was refusing to implement certain provisions of L.B. 50 retroactively, in reliance on that letter. Although this action was filed outside the 10-day timeframe, the court concluded "the Legislature did not intend for the ten-working-day period to be jurisdictional." It reasoned that treating the 10-day filing requirement as jurisdictional would allow the Attorney General to avoid the statutory duty to bring an action to determine constitutionality "simply by letting time pass." It observed that, typically, the Attorney General has no control over whether, or when, a state officer may refuse to implement an act in reliance on an Attorney General's written opinion; therefore, the court concluded that treating the 10-day period as jurisdictional would lead to the "nonsensical" result that the time to file suit could expire before the Attorney General is even aware that the circumstances for filing suit have been triggered. Ultimately, the court concluded the 10-day filing requirement may be important for purposes of mandamus, but it was not a jurisdictional requirement, and, therefore, the Attorney General's delay in filing did not affect the court's authority to determine the constitutional validity of L.B. 50 in this action.

Finally, the court addressed and rejected the Secretary's contention that this action did not present a justiciable

---

[10] See, e.g., § 83-1,110.05(2) (requiring DCS to "identify committed offenders who may be eligible for geriatric parole"); Neb. Rev. Stat. § 83-1,109 (Reissue 2024) (DCS director "shall inform" Board of Parole "of all committed offenders who are expected to become eligible for release on parole within the next three months").

[11] § 84-215.

controversy. The Secretary had argued that the constitutionality of L.B. 50's new parole eligibility provisions was not justiciable unless and until the Board of Parole actually granted "early parole" to a committed offender under the new provisions. The court disagreed, reasoning that the procedure authorized by § 84-215 "exists to adjudicate just this type of controversy." Moreover, the court found the matter was justiciable because a "present, substantial controversy exists in this case between the Attorney General, who has advised that the retroactive portion of the act is unconstitutional, and the Secretary . . . , who by [§ 84-215] is directed to defend the constitutionality" of the act.

The district court therefore concluded that this action was properly filed under the procedure authorized by § 84-215, that it presented a justiciable controversy, and that the constitutional validity of L.B. 50's new parole eligibility provisions was properly before the court.

*(ii) Court Finds L.B. 50 Results in Commutation*

In considering the merits of the constitutional challenge, the district court first concluded, under the plain language of § 57, that the Legislature intended the new parole eligibility provisions in §§ 47 and 48 to apply not just prospectively to offenders sentenced after the effective date of L.B. 50, but also retrospectively to all committed offenders under sentence and on parole as of the effective date of the act. The court then considered the Attorney General's primary argument—that when L.B. 50's new parole eligibility provisions are applied retroactively to committed offenders whose sentence is final, it results in a commutation.

The court acknowledged that parole, by itself, is not a commutation.[12] And it acknowledged that fixing eligibility for

---

[12] See *State v. Castaneda*, 287 Neb. 289, 313, 842 N.W.2d 740, 758 (2014) (emphasizing parole and commutation are different legal concepts, because parole is "'a regular part of the rehabilitative process,'" while commutation is exercise of executive clemency).

parole is a matter properly within the Legislature's province.[13] But the court agreed with the Attorney General that when L.B. 50's new parole eligibility provisions are considered with the existing statutes that authorize good time credits for parolees,[14] a commutation results. In reaching this conclusion, the court applied a definition of commutation from *State v. Spady*,[15] where we said, "'Commutation of punishment is substitution of a milder punishment known to the law for the one inflicted by the court.'"

The court reasoned that L.B. 50's new parole eligibility provisions allow committed offenders to be granted parole status sooner than was possible under the law in effect before L.B. 50 and that under current good time statutes, parolees are entitled to have their parole term reduced by 10 days each month for good conduct.[16] The court thus concluded that "sentenced offenders who are paroled early under [L.B. 50] will receive additional good time which will ***reduce their maximum sentence***. That is a commutation." (Emphasis in original.)

### (iii) Court Finds Retroactivity
### Provision Is Severable

Finally, the court considered whether the unconstitutional provisions of L.B. 50 could be severed from the rest of the act. Applying the severability framework from *State ex rel. Bruning v. Gale*,[17] the court concluded that "the part of Section 57 that retroactively applies Sections 47 and 48 to

---

[13] See *Adams v. State*, 293 Neb. 612, 879 N.W.2d 18 (2016) (holding conditions clause of Neb. Const. art. IV, § 13, permits Legislature to enact laws placing conditions on parole eligibility of committed offenders).

[14] See § 83-1,108.

[15] *State v. Spady*, 264 Neb. 99, 102, 645 N.W.2d 539, 542 (2002) (quoting *Lincoln v. Sigler*, 183 Neb. 347, 160 N.W.2d 87 (1968)).

[16] See § 83-1,108(1) ("[t]he board shall reduce, for good conduct in conformity with the conditions of parole, a parolee's parole term by ten days for each month of such term").

[17] *State ex rel. Bruning v. Gale*, 284 Neb. 257, 817 N.W.2d 768 (2012).

committed offenders with final sentences can be severed from the remainder of the act."

### (iv) Court Enters Declaratory Judgment

The district court entered summary judgment in favor of the Attorney General, and the decretal portion of the court's judgment included the following declaration:

> Section 57 of L.B. 50 (2023) violates Neb. Const. art. II, § 1 and art. IV, § 13 by retroactively applying Sections 47 and 48 to committed offenders whose sentences became final on or before L.B. 50's effective date of September 2, 2023. The part of Section 57 that retroactively applies Sections 47 and 48 to offenders who were finally sentenced on or before September 2, 2023 is severed from the remainder of the act.

The Secretary filed a timely notice of appeal, and we moved the matter to our docket. The Attorney General, as the party asserting that L.B. 50 is unconstitutional, filed a notice of constitutional question pursuant to Neb. Ct. R. App. P. § 2-109(E) (rev. 2023).

### 6. Repeal of § 84-215

In April 2024, while this appeal was pending, the Legislature passed a bill that repealed § 84-215, effective July 19, 2024.[18] The Secretary argues that the repeal of § 84-215 "remove[d] the Attorney General's power to bring suit against the Secretary . . . , making this suit moot."[19] The Attorney General disagrees and offers several reasons why the repeal of § 84-215 did not affect his authority to bring this action. Because mootness is a justiciability doctrine that operates to prevent courts from exercising jurisdiction,[20] we address the parties' mootness arguments in more detail later in our analysis, before reaching the merits.

---

[18] See 2024 Neb. Laws, L.B. 287.

[19] Reply brief for appellant at 6.

[20] See *In re Guardianship of Tomas J., ante* p. 503, 18 N.W.3d 87 (2025).

## II. ASSIGNMENTS OF ERROR

[1] The Secretary's brief did not contain a separately designated assignments of error section. The Nebraska Rules of Appellate Practice have long required an appellant's brief to contain certain sections, under appropriate headings, including a section that contains a "separate, concise statement of each error a party contends was made by the trial court"[21] and that "[e]ach assignment of error shall be separately numbered and paragraphed."[22] Parties who wish to secure appellate review must abide by the rules of the Nebraska Supreme Court, and those who fail to comply with the appellate briefing rules do so at their own peril.[23]

[2] Although the Secretary's brief contains no assignment of error section, headings in the argument section of the brief assert (1) that this appeal was rendered moot by the repeal of § 84-215 and (2) that L.B. 50's new parole eligibility provisions do not result in a commutation and are, therefore, constitutional. At oral argument before this court, the Secretary's counsel suggested that these argument headings provide a sufficient substitute for a separately designated assignments of error section, but we have consistently rejected that suggestion in the past,[24] and we must reject it here.

[3] Rather, we apply the settled rule that where an appellant's assignments of error are not properly designated and instead consist of headings or subparts of arguments and are not within a designated assignments of error section, "an appellate court may proceed as though the party failed to file a brief, providing no review at all, or, alternatively, may examine

---

[21] § 2-109(D)(1)(e).

[22] *Id.*

[23] See *County of Lancaster v. County of Custer*, 313 Neb. 622, 985 N.W.2d 612 (2023).

[24] See *id.* at 629, 985 N.W.2d at 619 (noting "[w]e have consistently rejected headings in the argument section as a sufficient substitute for assignments of error contained in the proper place and properly designated").

the proceedings for plain error."[25] Because this appeal involves a judicial declaration that an act of the Legislature is unconstitutional, we opt to examine the proceedings for plain error, rather than provide no review at all.

[4-6] When reviewing proceedings for plain error, we are not constrained by the specific arguments raised in the briefs, nor are we required to consider every error that may have occurred in the lower court.[26] Instead, when reviewing for plain error, an appellate court is concerned with error that is plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.[27] We recently emphasized that "courts should find plain error 'only in those rare instances where it is warranted,' as opposed to invoking it 'routinely.'"[28] Generally, an appellate court will find plain error only when a miscarriage of justice would otherwise occur.[29]

Guided by these principles, we focus our plain error review on a single issue: whether the district court plainly erred in its conclusion that L.B. 50's new parole eligibility provisions, when applied retroactively to committed offenders under sentence as of the effective date of the act, result in a commutation and infringes upon the clemency power granted to the Board of Pardons in article IV, § 13, of the Nebraska Constitution.

[7] However, before we conduct our plain error review, we must address two threshold issues that bear on whether we

---

[25] *Id*. at 629, 985 N.W.2d at 619-20. Accord *Mathiesen v. Kellogg*, 315 Neb. 840, 1 N.W.3d 888 (2024).

[26] See *Peterson v. Brandon Coverdell Constr., ante* p. 342, 15 N.W.3d 698 (2025).

[27] See, *Castillo v. Libert Land Holdings 4*, 316 Neb. 287, 4 N.W.3d 377 (2024); *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014).

[28] *Peterson, supra* note 26, *ante* at 350, 15 N.W.3d at 704 (quoting *State v. McSwine*, 292 Neb. 565, 873 N.W.2d 405 (2016)).

[29] *Peterson, supra* note 26; *State v. Mabior*, 314 Neb. 932, 994 N.W.2d 65 (2023), *cert. denied* ___ U.S. ___, 144 S. Ct. 1073, 218 L. Ed. 2d 249 (2024); *State v. Senteney*, 307 Neb. 702, 950 N.W.2d 585 (2020).

have jurisdiction to reach the merits at all.[30] The first issue is one of standing, and it requires us to determine whether this declaratory judgment action was properly filed against the Secretary under the provisions of § 84-215. The second issue is one of mootness, and it requires us to determine whether the Legislature's repeal of § 84-215 has rendered this appeal moot. When considering these jurisdictional issues, we do not apply a plain error standard of review, because plain error review does not, and cannot, constrain an appellate court's duty to ensure that it has jurisdiction.[31] Therefore, even when circumstances may warrant plain error review of the merits, an appellate court will analyze its jurisdiction using the same standard of review ordinarily applied to jurisdictional issues.[32]

## III. STANDARD OF REVIEW

[8] Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.[33]

[9] When a jurisdictional issue does not involve a factual dispute, determination of a jurisdictional issue is a matter of law which requires an appellate court to reach a conclusion independent from the trial court's; however, when a determination rests on factual findings, a trial court's decision on the

---

[30] See, *State ex rel. Constance v. Evnen*, 317 Neb. 600, 10 N.W.3d 763 (2024) (before reaching legal issues presented for review, appellate court has duty to determine whether it has jurisdiction over matter before it); *State v. Kelley*, 305 Neb. 409, 940 N.W.2d 568 (2020) (before reaching merits of issues presented for review, appellate court has duty to determine it has jurisdiction to decide them).

[31] See *Noland v. Yost*, 315 Neb. 568, 998 N.W.2d 57 (2023) (independently reviewing jurisdictional issue but reviewing merits for plain error because appellant failed to comply with appellate briefing rules). Accord *McCoy v. U.S.*, 266 F.3d 1245, 1249 (11th Cir. 2001) (noting "jurisdictional errors are not subject to plain- or harmless-error analysis").

[32] See *id.*

[33] *Castillo, supra* note 27; *Steffy, supra* note 27.

issue will be upheld unless the factual findings concerning jurisdiction are clearly incorrect.[34]

[10] Because mootness is a justiciability doctrine that operates to prevent courts from exercising jurisdiction, an appellate court considers mootness under the same standard of review as other jurisdictional questions.[35]

## IV. ANALYSIS

[11] Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.[36] As stated, there are two jurisdictional issues we must address as a threshold matter, and both pertain to § 84-215.

### 1. Was This Action Properly Filed Against Secretary Under Provisions of § 84-215?

At oral argument before this court, both the Attorney General and the Secretary took the position that this declaratory judgment action was properly filed under the provisions of § 84-215, naming the Secretary as the only defendant. This issue implicates our jurisdiction because, as we will explain, it is only within the statutory framework of § 84-215 that the Secretary can be said to have a litigable interest in this controversy.

[12,13] Under Nebraska law, a jurisdictional prerequisite for obtaining declaratory relief is that the parties must have a legally protectible interest or right in the controversy at issue.[37]

---

[34] *Western Ethanol Co. v. Midwest Renewable Energy*, 305 Neb. 1, 938 N.W.2d 329 (2020); *Hawley v. Skradski*, 304 Neb. 488, 935 N.W.2d 212 (2019).

[35] See *In re Guardianship of Tomas J., supra* note 20.

[36] *Noland, supra* note 31.

[37] See, *Omaha Pub. Power Dist. v. Nuclear Elec. Ins. Ltd.*, 229 Neb. 740, 745, 428 N.W.2d 895, 899 (1988) (statute authorizing declaratory judgment actions is applicable only where parties have "'a legally protectible interest or right in the controversy'"); *Stahmer v. Marsh*, 202 Neb. 281, 275 N.W.2d 64 (1979).

Sometimes referred to as a "litigable" interest,[38] this is an issue of standing, and standing is a jurisdictional component of a party's case because only a party who has standing may invoke the jurisdiction of a court.[39]

Section 84-215 was in full force and effect when the Attorney General commenced this action, and it provided that in any action "filed under the provisions of this section, the Attorney General may sue as defendant any person having a litigable interest in the matter or in lieu thereof may sue the Secretary."[40] Moreover, when sued under § 84-215, the Secretary has a statutorily imposed "duty to defend such action and to support the constitutionality of the act" being challenged.

The parties agree that the Secretary has no statutory or common-law duty to implement any of the challenged provisions of L.B. 50; instead, his only litigable interest in this controversy arises from the statutory duty imposed upon the Secretary by § 84-215. This highlights the potential jurisdictional significance of the district court's determination that this action was properly brought under the provisions of § 84-215, because the Secretary's standing as a proper defendant depends entirely on whether the action was "*filed under the provisions* of [§ 84-215]."[41]

---

[38] See *State ex rel. Spire v. Northwestern Bell Tel. Co*., 233 Neb. 262, 264, 445 N.W.2d 284, 287 (1989).

[39] *Preserve the Sandhills v. Cherry County*, 313 Neb. 590, 985 N.W.2d 599 (2023). See, also, *Planned Parenthood of the Heartland v. Hilgers*, 317 Neb. 217, 9 N.W.3d 604 (2024) (reaching merits of declaratory judgment action challenging constitutionality of statute where one of multiple plaintiffs had standing); *State ex rel. Spire, supra* note 38 (noting respondent telephone company had "litigable interest" in declaratory judgment action brought by Attorney General challenging constitutionality of statute).

[40] § 84-215.

[41] *Id*. (emphasis supplied). See, also, *Omaha Pub. Power Dist., supra* note 37.

When discussing the provisions of § 84-215 and the factual circumstances that will trigger the Attorney General's duty to bring an action to determine the validity of an act, our cases have focused on only two requirements: (1) the Attorney General must have issued a written opinion that an act of the Legislature is unconstitutional and (2) a state officer charged with implementing the act must have refused to do so in reliance on that opinion.[42] While both of these requirements are conditions precedent to the duty to bring an action under § 84-215,[43] our cases have not described either of these requirements, or any other provision of § 84-215, as a jurisdictional prerequisite.

We note the Legislature did not define the term "written opinion" for purposes of § 84-215, and our cases have not defined it either. Anecdotally, most of the reported opinions in actions brought pursuant to § 84-215 appear to have involved a formal written opinion issued by the Attorney General and archived by number and year on the Attorney General's website.[44] But we appreciate nothing in the plain text of § 84-215 that requires a written opinion on unconstitutionality to be issued in any particular format and nothing that precludes issuing a written opinion on unconstitutionality in a letter format.

Moreover, we have declined to scrutinize the sufficiency of a written opinion for purposes of § 84-215 once a state officer refuses to implement an act in reliance on the opinion and the Attorney General files suit to determine the validity of the

---

[42] See, *State ex rel. Peterson v. Shively*, 310 Neb. 1, 963 N.W.2d 508 (2021); *State ex rel. Bruning, supra* note 17; *State ex rel. Nebraska Nurses Assn. v. State Board of Nursing*, 205 Neb. 792, 290 N.W.2d 453 (1980).

[43] See *State ex rel. Nebraska Nurses Assn., supra* note 42.

[44] See, e.g., *State ex rel. Spung v. Evnen*, 317 Neb. 800, 12 N.W.3d 229 (2024); *State ex rel. Peterson, supra* note 42; *State ex rel. Bruning, supra* note 17; *State ex rel. Stenberg v. Moore*, 258 Neb. 738, 605 N.W.2d 440 (2000); *State ex rel. Spire v. Beermann*, 235 Neb. 384, 455 N.W.2d 749 (1990).

act. In *State ex rel. Bruning v. Gale*,[45] the Secretary argued that this court lacked jurisdiction under § 84-215 because the written opinion on unconstitutionality was not sufficiently definitive. We soundly rejected that argument, reasoning that once an action is commenced under § 84-215, the court's review arises from the decision of an official to refuse to implement an act in reliance on the Attorney General's opinion, and, therefore, the court is "asked to determine whether the statute is unconstitutional, not to decide whether the Attorney General's opinion is correct."[46]

Given the Legislature's repeal of § 84-215, and particularly since we are reviewing the merits of this proceeding only for plain error, we see no compelling reason to refine our jurisprudence on the "written opinion" requirement in § 84-215. Instead, we consider only whether, given our existing precedent, the district court was clearly incorrect in treating the Attorney General's letter as a written opinion on unconstitutionality for purposes of determining whether this action was properly brought under § 84-215.

On this record, we question whether the Attorney General intended the September 6, 2023, letter to be a written opinion on constitutionality sufficient to trigger § 84-215. But regardless of the Attorney General's intentions when he wrote the letter, we cannot find the trial court was clearly incorrect in treating the letter as a written opinion for purposes of § 84-215. The factual record establishes that the letter was written in response to a request for a written opinion on the validity of L.B. 50's new parole eligibility provisions, the letter contained the Attorney General's opinion that the provisions were unconstitutional, and the DCS director refused to implement the provisions based on that written opinion. And under our case law, once the Attorney General filed this action under § 84-215, the court's task was to determine the

---

[45] *State ex rel. Bruning, supra* note 17.

[46] *Id.* at 262, 817 N.W.2d at 773.

constitutional validity of the act, not to question the suffi-
ciency of the Attorney General's opinion.[47]

We therefore conclude, as did the district court, that this
action was properly filed under the provisions of § 84-215.
We likewise conclude the Secretary is a proper defendant with
standing to invoke the court's jurisdiction in this declaratory
judgment action. We turn now to the next jurisdictional issue:
the Secretary's contention that the Legislature's subsequent
repeal of § 84-215 has rendered this appeal moot.

## 2. Appeal Not Moot

[14-17] Although we are reviewing this proceeding for plain
error, the question of mootness bears directly on our appel-
late jurisdiction.[48] A case is moot if the facts underlying the
dispute have changed, such that the issues presented are no
longer alive.[49] Stated differently, a case becomes moot when
the issues initially presented in litigation cease to exist or
the litigants lack a legally cognizable interest in the outcome
of litigation.[50] The central question in a mootness analysis is
whether changes in circumstances that prevailed at the begin-
ning of litigation have forestalled any occasion for meaning-
ful relief.[51]

### (a) Arguments of Parties

The Secretary argues that because § 84-215 was repealed by
the Legislature while this matter was pending on appeal, the
Attorney General no longer has a cognizable legal interest in

---

[47] See *id*.

[48] See, e.g., *In re Guardianship of Tomas J., supra* note 20 (holding mootness
does not prevent appellate jurisdiction but is justiciability doctrine that can
prevent courts from exercising jurisdiction); *Johnson v. Vosberg*, 316 Neb.
658, 6 N.W.3d 216 (2024) (same).

[49] *NP Dodge Mgmt. Co. v. Holcomb*, 314 Neb. 748, 993 N.W.2d 105 (2023).

[50] *In re Interest of Taylor W.*, 276 Neb. 679, 757 N.W.2d 1 (2008).

[51] *MIMG LXXIV Colonial v. Ellis*, 316 Neb. 746, 6 N.W.3d 799 (2024).

the outcome of this appeal, and it has thus become moot. The Attorney General disagrees, offering several reasons why the repeal of § 84-215 did not render this appeal moot.

First, the Attorney General argues that under the general saving provisions of Neb. Rev. Stat. § 49-301 (Reissue 2021), the repeal of § 84-215 has no effect on this pending action, particularly since the Secretary has "elected to continue defending L.B. 50, as shown by his decision to continue pursuing rather than dismiss this appeal."[52] Next, the Attorney General argues that despite the repeal of § 84-215, he can rely on other statutory and common-law authority to bring a declaratory judgment action challenging the constitutionality of a statute, although he does not explain how, under such authority, the Secretary would be a proper party defendant. Finally, the Attorney General argues that even if the case is "technically moot"[53] due to the repeal of § 84-215, we should apply the public interest exception to reach the merits of the lower court's declaration that L.B. 50 is unconstitutional.

We need not address all these arguments, because we agree with the Attorney General that the general saving provision in § 49-301 applies, and, consequently, the repeal of § 84-215 does not affect this pending action.

## (b) General Saving Statute Applies

The general saving statute provides: "Whenever a statute shall be repealed, such repeal *shall in no manner affect pending actions founded thereon*, nor causes of action not in suit that accrued prior to any such repeal, except as may be provided in such repealing statute."[54] Here, the bill that repealed § 84-215[55] did not purport to exempt the repeal from the

---

[52] Brief for appellee at 14.

[53] *Id.* at 21.

[54] § 49-301 (emphasis supplied).

[55] 2024 Neb. Laws, L.B. 287.

general saving statute,[56] and we conclude the general saving statute is applicable. That is so because this action was founded on § 84-215 and was pending on appeal when the Legislature repealed § 84-215. More specifically, on the date the repeal became effective, the district court had already entered its declaratory judgment; this appeal had been perfected by the Secretary; and the matter was pending oral argument.

[18,19] But we have consistently said that even when the general saving statute in § 49-301 is applicable, it relates to substantive and not procedural law.[57] Substantive law commonly creates duties, rights, and obligations of a party, whereas a procedural law prescribes the means and methods through and by which substantive laws are enforced and applied.[58] Section 84-215 was substantive in nature because it imposed a duty on the Attorney General to file an action to determine the validity of an act under certain circumstances, and it imposed a commensurate obligation on the Secretary to defend the constitutionality of the act. We therefore conclude that pursuant to § 49-301, the repeal of § 84-215 "in no manner affect[ed] pending actions founded thereon."[59]

Having concluded that this appeal was not rendered moot by the repeal of § 84-215, we turn now to the primary issue on appeal: the district court's declaration that L.B. 50's new parole eligibility provisions result in an impermissible commutation when applied to committed offenders under sentence on the date L.B. 50 went into effect.

---

[56] Compare *id.*, with *City of Fremont v. Dodge County*, 130 Neb. 856, 866, 266 N.W. 771, 776 (1936) (holding general saving statute did not apply because repealing act expressly stated that "section 49-301 . . . shall not apply").

[57] See *Denver Wood Products Co. v. Frye*, 202 Neb. 286, 275 N.W.2d 67 (1979).

[58] *In re Guardianship of Carlos D.*, 300 Neb. 646, 915 N.W.2d 581 (2018).

[59] § 49-301.

### 3. Court Plainly Erred in Declaring L.B. 50's New Parole Eligibility Provisions Unconstitutional

Determining whether a statute is constitutional presents a question of law, and ordinarily this court considers that question de novo and resolves it independently of any determination by the lower court, the Attorney General, or the Secretary of State.[60] But as we have already explained, in this appeal, we are reviewing the lower court's determination for plain error due to the Secretary's noncompliance with appellate briefing rules. Although plain error review is necessarily more limited than de novo review,[61] we are guided by the same familiar principles whenever we review a determination that a statute is unconstitutional.

[20-23] A statute is presumed to be constitutional, and all reasonable doubts are resolved in favor of its constitutionality.[62] The burden of establishing the unconstitutionality of a statute is on the one attacking its validity.[63] It is not the province of a court to annul a legislative act unless it clearly contravenes the constitution and no other resort remains.[64] A penal statute must be construed so as to meet constitutional requirements if such can reasonably be done.[65]

In addition to these general principles, a determination of unconstitutionality by the Nebraska Supreme Court is subject to the supermajority requirement in the Nebraska Constitution, which provides, "No legislative act shall be held

---

[60] See *State ex rel. Spung, supra* note 44.

[61] See, e.g., *Peterson, supra* note 26, *ante* at 350, 15 N.W.3d at 704 (noting that if plain error review rule is "to serve as a meaningful incentive for parties to file a statement of errors, the review must be truly limited").

[62] *State v. Gnewuch*, 316 Neb. 47, 3 N.W.3d 295 (2024); *Adams, supra* note 13.

[63] *Adams, supra* note 13. See *Gnewuch, supra* note 62.

[64] *Gnewuch, supra* note 62.

[65] *Id*.; *State v. Montoya*, 304 Neb. 96, 933 N.W.2d 558 (2019). Accord *State v. Wagner*, 295 Neb. 132, 888 N.W.2d 357 (2016).

unconstitutional except by the concurrence of five judges."[66] At oral argument before this court, both parties took the position that this supermajority requirement would apply to a decision of this court affirming the lower court's determination that L.B. 50 is unconstitutional, even if such affirmance were based on a limited plain error review rather than a full de novo review. Our prior opinions have not expressly considered that question. But we need not consider it here, either, because our plain error review convinces us that we must reverse, rather than affirm, the lower court's declaration of unconstitutionality.

In the sections that follow, we summarize the trial court's reasoning and then review the applicable law regarding commutations, parole eligibility, and good time. Ultimately, we find plain error in the district court's declaration that L.B. 50's new parole eligibility provisions result in an impermissible commutation when applied retroactively to offenders under sentence.

### (a) District Court's Reasoning

As succinctly summarized by the Attorney General, the district court's declaration of unconstitutionality is premised on the following reasoning:

> L.B. 50's retroactive expansion of parole eligibility, working in tandem with Nebraska's statutes that extend additional good time credit to parolees, constitutes a commutation. Parolees are entitled by statute to 10 days of additional good time credit per month. This additional good time is applied against a parolee's maximum imposed sentence and thus hastens the satisfaction of that sentence. Thus, an offender who receives the retroactive benefit of L.B. 50 will be released from custody earlier than he would have been if L.B. 50's changes did not apply to him. Retroactive application of L.B. 50 thus

---

[66] Neb. Const. art. V, § 2.

substitutes a milder (shorter) sentence for the harsher (longer) one previously imposed.[67]

To consider whether this reasoning is sound, we review relevant Nebraska case law regarding commutation, parole, and good time.

### (b) Nebraska Law on Commutations

[24] "'Commutation of punishment is substitution of a milder punishment known to the law for the one inflicted by the court.'"[68] In other words, the essence of a commutation is substituting a milder punishment for the sentence originally imposed.[69]

Because only the Board of Pardons has the constitutional authority to commute sentences for offenses other than treason and impeachment,[70] we have declared as unconstitutional statutes that purport to authorize trial judges to modify final sentences, reasoning that such statutes impermissibly allow judges to exercise the commutation power belonging to the Board of Pardons.[71]

---

[67] Brief for appellee at 14-15.

[68] *Spady, supra* note 15, 264 Neb. at 102, 645 N.W.2d at 542 (quoting *Lincoln, supra* note 15).

[69] See *State v. Bainbridge*, 249 Neb. 260, 543 N.W.2d 154 (1996).

[70] See Neb. Const. art. IV, § 13.

[71] See, *Bainbridge, supra* note 69, 249 Neb. at 265, 543 N.W.2d at 158-59 (holding Neb. Rev. Stat. § 60-6,209 (Reissue 1993) unconstitutional because it authorized sentencing courts to reduce 15-year license revocations after period of 5 years and thus "permits a judicial commutation of a sentence of punishment"); *State v. Jones*, 248 Neb. 117, 532 N.W.2d 293 (1995) (holding Neb. Rev. Stat. § 29-2931 (Cum. Supp. 1994) unconstitutional because it authorized sentencing courts to reduce final sentence and thus exercise commutation power by substituting milder punishment); *State v. Philipps*, 246 Neb. 610, 616, 521 N.W.2d 913, 917 (1994) (holding Neb. Rev. Stat. § 29-2308.01 (Reissue 1989) unconstitutional because it allowed sentencing courts to reduce final sentences under certain circumstances and "a sentencing court which chooses to substitute a milder punishment for the sentence it had originally imposed does the very thing which defines an act of commutation").

The question presented here is whether L.B. 50's new parole eligibility provisions, considered either alone or alongside Nebraska's existing parole good time statutes, result in substituting a milder punishment for the sentence originally imposed. To answer this question, it is helpful to recall the function of parole and the function of good time reductions under Nebraska's sentencing scheme.

(c) Parole and Parole Eligibility

[25,26] Both this court and the U.S. Supreme Court have recognized that parole and commutation are different concepts as a matter of law and serve different functions in the correctional process.[72] As stated, commutation occurs when a milder punishment is substituted for the punishment imposed by the sentencing court.[73] But as the U.S. Supreme Court has explained:

> Parole is a regular part of the rehabilitative process. Assuming good behavior, it is the normal expectation in the vast majority of cases. The law generally specifies when a prisoner will be eligible to be considered for parole, and details the standards and procedures applicable at that time. See, *e. g.*, *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1[, 99 S. Ct. 2100, 60 L. Ed. 2d 668] (1979) (detailing Nebraska parole procedures); *Morrissey* v. *Brewer*, 408 U. S. 471, 477[, 92 S. Ct. 2593, 33 L. Ed. 2d 484] (1972) ("the practice of releasing prisoners on parole before the end of their sentences has become an integral part of the penological system"). Thus it is possible to predict, at least to some extent, when parole might be granted. Commutation, on the other hand, is an ad hoc exercise of executive clemency.[74]

---

[72] See *Castaneda, supra* note 12. See, also, *Solem v. Helm*, 463 U.S. 277, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983).

[73] See *Spady, supra* note 15. See, also, *Bainbridge, supra* note 69 (holding essence of commutation is substitution of milder punishment).

[74] *Solem, supra* note 72, 463 U.S. at 300-01.

[27] Under Nebraska's constitution and statutes, both the Board of Parole and the Legislature have a role to play in the parole process. In *Adams v. State*,[75] we explained that although Neb. Const. art. IV, § 13, vests the Board of Parole with the power to grant paroles for criminal offenses other than treason and impeachment, it gives the Legislature the power to place conditions on parole eligibility.[76] This is so because the conditions clause of Neb. Const. art. IV, § 13, permits the Legislature to enact laws placing conditions on when a committed offender is eligible for parole. *Adams* further explained that "a committed inmate must meet statutory requirements— i.e., 'conditions'—before being considered eligible for parole. But once an inmate is eligible for parole, the Board [of Parole] alone has authority to grant parole—the Legislature has no power over the decision whether to grant release on parole."[77] Because the Legislature has constitutional authority to establish parole eligibility conditions, *Adams* held that the parole eligibility conditions in § 83-1,110(1) do not "infringe on the [Board of Parole's] authority to grant paroles for any offenses."[78]

L.B. 50 amended the parole eligibility provisions of § 83-1,110(1) and recited the Legislature's intent that the new parole eligibility provisions "apply to all committed offenders under sentence or on parole on or after September 2, 2023, and to all persons sentenced on and after such date."[79] Although the new parole eligibility provisions in L.B. 50 will allow the Board of Parole to place some committed offenders on parole status sooner than they could have under the prior law, parole status does not modify the sentence or substitute a milder punishment.

---

[75] *Adams, supra* note 13.

[76] *Id.*

[77] *Id*. at 619, 879 N.W.2d at 23.

[78] *Id*. at 622, 879 N.W.2d at 25.

[79] § 83-1,135.02(5).

[28,29] When the Board of Parole places eligible offenders on parole status, those offenders are conditionally released from the custody of DCS, but they remain in the legal custody and control of the Board of Parole until either their parole is revoked and they are recommitted to the custody of DCS[80] or they are discharged from parole upon completion of their sentence.[81] As such, with the possible exception of an offender whose lawful sentence excludes the possibility of parole, granting parole status to a committed offender does not modify or reduce the sentence imposed; it merely changes the circumstances under which the sentence is being served.[82] As the U.S. Supreme Court has recognized:

> [T]he practice of releasing prisoners on parole before the end of their sentences has become an integral part of the penological system. . . . Rather than being an *ad hoc* exercise of clemency, parole is an established variation on imprisonment of convicted criminals. Its purpose is to help individuals reintegrate into society as constructive individuals as soon as they are able, without being confined for the full term of the sentence imposed. It also serves to alleviate the costs to society of keeping an individual in prison. The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence.[83]

Parole itself is not an act of clemency or commutation, and we do not understand the district court to have concluded

---

[80] See Neb. Rev. Stat. § 83-1,121 (Reissue 2024).

[81] See Neb. Rev. Stat. § 83-1,118(2) (Reissue 2024) (Board of Parole shall discharge parolee "when the time served in the custody of the department and the time served on parole equal the maximum term less good time").

[82] See *McCulley v. State*, 486 S.W.2d 419 (Mo. 1972) (granting of parole does not reduce sentence imposed but may change location and circumstances under which sentence is served).

[83] *Morrissey v. Brewer*, 408 U.S. 471, 477, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972).

otherwise. Nor do we understand the district court to have concluded that L.B. 50's new parole eligibility provisions, standing alone, work as a commutation of an offender's sentence. Instead, the district court reasoned that when committed offenders under sentence are granted parole under L.B. 50's new parole eligibility provisions, it is the accrual of additional parole good time that works as a commutation. We turn to that reasoning next and ultimately reject it.

(d) Good Time

[30] The Legislature declares the law and public policy by defining crimes and fixing their punishment.[84] And in connection with fixing criminal punishments, the Nebraska Legislature has long authorized "good time" reductions for offenders sentenced to terms of imprisonment.

As early as 1871, the Nebraska Legislature authorized all prisoners to receive "deduction[s]" from their sentence for good behavior, entitling them "to their discharge so much the sooner."[85] In 1921, the Legislature amended the good time statutes to apply to "[e]very convict who is now or who may hereafter be confined in the Nebraska penitentiary" and authorized sentence reductions of several months for each year served when offenders followed prison rules and performed their duties "in an orderly and peaceable manner."[86] It is not necessary here to chronicle all the various amendments to Nebraska's good time statutes; it is sufficient to note that over the years, the Legislature has amended the good time statutes to change not only the type and amount of good time available to those serving prison sentences, but also to change the manner in which such good time credits are to be applied.[87]

---

[84] See *State v. Huff*, 282 Neb. 78, 802 N.W.2d 77 (2011).

[85] 1871 Neb. Laws, p. 79.

[86] Comp. Stat. § 10260 (1922).

[87] See, e.g., 2011 Neb. Laws, L.B. 191; 1975 Neb. Laws, L.B. 567; 1972 Neb. Laws, L.B. 1499; 1969 Neb. Laws, ch. 817, § 1-88, pp. 3071-3113.

[31,32] Because the good time statutes have been amended multiple times, our cases hold that the good time scheme to be applied to a defendant's sentence is the law in effect at the time the defendant's sentence becomes final.[88] As such, under Nebraska law, the good time statutes in effect when an offender's sentence becomes final are considered an integral part of the sentence imposed.[89] This is illustrated by the requirement that sentencing courts, as part of the truth in sentencing advisement, must advise offenders "on the record the time the offender will serve on his or her maximum term before attaining mandatory release assuming that no good time for which the offender will be eligible is lost."[90]

The settled rule that an offender's sentence is subject to the good time laws in effect at the time his or her sentence becomes final also explains why, when the Legislature amends a good time statute to increase available good time, our cases generally hold that applying the new good time provisions retroactively amounts to a commutation by substituting a shorter sentence for the one imposed.[91] It is also why, when good time statutes are amended to decrease available good time, courts generally hold that applying the new good time provisions retroactively violates ex post facto principles.[92] It

---

[88] See, e.g., *Heist v. Nebraska Dept. of Corr. Servs.*, 312 Neb. 480, 979 N.W.2d 772 (2022); *State v. Nollen*, 296 Neb. 94, 892 N.W.2d 81 (2017).

[89] See *id.* Accord *Weaver v. Graham*, 450 U.S. 24, 31, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981) (rejecting contention that statutory good time scheme in place at time of sentencing was "'no part of the original sentence'" imposed).

[90] Neb. Rev. Stat. § 29-2204 (Cum. Supp. 2024).

[91] See, e.g., *Duff v. Clarke*, 247 Neb. 345, 526 N.W.2d 664 (1995); *Philipps, supra* note 71; *Stewart v. Clarke*, 240 Neb. 397, 482 N.W.2d 248 (1992); *Luxford v. Benson*, 216 Neb. 115, 341 N.W.2d 925 (1983); *Boston v. Black*, 215 Neb. 701, 340 N.W.2d 401 (1983); *Johnson & Cunningham v. Exon*, 199 Neb. 154, 256 N.W.2d 869 (1977).

[92] See, e.g., *Weaver, supra* note 89, 450 U.S. at 32 (statute retroactively reducing the amount of "gain time" credits a prisoner could receive was unconstitutional as ex post facto law).

appears the district court relied on some of these cases in its reasoning, but we do not see the relevance of cases concerning amendments to good time statutes, because as we will explain, L.B. 50 did not amend the good time statutes at all.

Nebraska law defines "good time" as "any reduction of sentence granted pursuant to sections 83-1,107 and 83-1,108."[93] Only the parole good time reductions authorized by § 83-1,108 are at issue here, and we limit our review accordingly.

### *(i) Parole Good Time Under § 83-1,108*

Since 1969, § 83-1,108 has authorized the Board of Parole to reduce the term of an offender's parole by a certain number of days each month for good conduct. "Parole term" is defined as "the time from release on parole to the completion of the maximum term, reduced by good time."[94] And "maximum term" is defined as "the maximum sentence provided by law or the maximum sentence imposed by a court, whichever is shorter."[95]

As originally enacted, § 83-1,108 entitled parolees to a reduction of 6 days per month for good conduct.[96] The Legislature amended that to 2 days per month in 1975,[97] and in 2011 increased it to the current 10 days per month.[98] Presently, § 83-1,108 provides:

> (1) The [B]oard [of Parole] shall reduce, for good conduct in conformity with the conditions of parole, a parolee's parole term by ten days for each month of such term. The total of such reductions shall be deducted from the maximum term, less good time granted pursuant to

---

[93] Neb. Rev. Stat. § 83-170(7) (Reissue 2024).

[94] § 83-170(11).

[95] § 83-170(8).

[96] See 1969 Neb. Laws, ch. 817, § 39, p. 3092.

[97] See 1975 Neb. Laws, L.B. 567, § 4.

[98] See 2011 Neb. Laws, L.B. 191, § 2.

section 83-1,107, to determine the date when discharge from parole becomes mandatory.

(2) Reductions of the parole terms may be forfeited, withheld, and restored by the [B]oard [of Parole] after the parolee has been consulted regarding any charge of misconduct or breach of the conditions of parole.

Importantly, L.B. 50 did not amend the good time provisions under either Neb. Rev. Stat. § 83-1,107(2) (Cum. Supp. 2022) or § 83-1,108, so the retroactive application of amendments to the good time statutes is simply not an issue in this case.[99] The district court acknowledged that L.B. 50 did not amend any of Nebraska's good time statutes, but it nevertheless concluded "the problem is that finally sentenced offenders who are paroled early under [L.B.50] will receive additional good time which will reduce their maximum sentence [and that] is a commutation." (Emphasis omitted.)

Although we agree that some committed offenders under sentence who are placed on parole as a result of L.B. 50's new parole eligibility provisions will begin accruing parole good time reductions sooner than they otherwise would have prior to the enactment of L.B. 50, we cannot agree that this accrual of good time impermissibly reduces their sentence or results in a commutation.

First, because the Board of Parole has discretion to decide whether and when to grant parole status to those who are eligible,[100] it cannot be assumed that all those who become parole eligible under L.B. 50's new parole eligibility provisions will be granted parole status sooner than they would have under the prior law. The parties' stipulated facts illustrate the fallacy of such an assumption. According to DCS, on the date L.B. 50 became effective, there were 529 committed offenders who were already parole eligible but who had not

---

[99] Compare, e.g., *Boston, supra* note 91, with *Johnson & Cunningham v. Exon, supra* note 91.

[100] See *Adams, supra* note 13.

yet been granted parole status by the Board of Parole. So although it may be reasonable to assume that some committed offenders who became parole eligible on the effective date of L.B. 50 will be granted parole status sooner than they would have under the prior law, the record shows that will not be true of all committed offenders.

But we see a more fundamental fallacy in the district court's reasoning—it assumes that when the Board of Parole places offenders on parole status because of L.B. 50's new parole eligibility provisions, such parolees will accrue "additional" good time beyond that to which they are entitled under the law in effect when their sentence became final. This is incorrect.

Both before and after the enactment of L.B. 50, Nebraska law entitled all committed offenders placed on parole (with the possible exception of those whose sentences became final before § 83-1,108 was enacted in 1969) to have their parole term reduced for good conduct, in accordance with the version of § 83-1,108 that was in effect when their sentence became final. This is so regardless of why, or when, the offender became eligible for parole and regardless of how long the offender may remain on parole. Of course, the amount of parole good time for which an offender is eligible will vary depending on the law in effect when the offender's sentence became final[101]; some offenders placed on parole after L.B. 50's effective date will be entitled to reductions of 10 days per month, and others could be entitled to reductions of as little as 2 days per month. But we see nothing retrospective about parolees accruing the good time reductions to which they are entitled under the law that was in effect when their sentences became final.

For committed offenders whose prison sentences became final after 1969 when § 83-1,108 was enacted, the accrual of parole good time is an integral part of the sentence imposed; and when parole good time is granted in accordance with the

---

[101] See, e.g., *Heist, supra* note 88; *Nollen, supra* note 88.

statutory scheme in place when the offender's sentence became final, it does not impermissibly shorten the sentence imposed. Rather, it effectuates it.

[33] Under Nebraska law, earlier parole eligibility does not commute an offender's sentence, being placed on parole status does not commute an offender's sentence, and accruing statutory good time reductions under the law in effect when the sentence became final does not commute an offender's sentence. Because none of these events, standing alone, commutes a sentence, we fail to see how combining them results in a commutation. Whether applied prospectively or retrospectively, L.B. 50's new parole eligibility provisions do not result in substituting a milder punishment for the sentence originally imposed.

### (ii) Declaration of Unconstitutionality Must Be Reversed

The district court erred in its declaration that L.B. 50's new parole eligibility provisions are unconstitutional when applied to committed offenders whose sentences became final before the effective date of the act. And because leaving an erroneous declaration of unconstitutionality uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process, we must reverse the judgment for plain error.[102]

### V. CONCLUSION

The retroactive application of L.B. 50's new parole eligibility provisions does not result in an unconstitutional sentence commutation, and it was plain error to declare otherwise. We therefore reverse the judgment of the district court.

Reversed.

_____

[102] See, *Castillo, supra* note 27; *Steffy, supra* note 27.